```
1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF ILLINOIS
2                               EASTERN DIVISION

3    DONALDSON TWYMAN,                 )  Docket No. 16 C 04182
                   Plaintiff,          )  Chicago, Illinois
4                                      )  July 7, 2017
              v.                       )  9:08 a.m.
5                                      )
     S&M AUTO BROKERS, INC., SAED      )
6    IHMOUD and MOHAMMED IHMOUD,       )
                   Defendants.         )
7

8             TRANSCRIPT OF PROCEEDINGS - SANCTIONS HEARING
                BEFORE THE HONORABLE VIRGINIA M. KENDALL
9

10   APPEARANCES:

11   For the Plaintiff:      DiTOMMASO LUBIN PC by
                             MR. PETER SCOTT LUBIN
12                           MR. ANDREW MURPHY
                             17 W 220 22nd Street, Suite 410
13                           Oakbrook Terrace, Illinois  60181

14   For the Defendants:     JAMES J. ROCHE AND ASSOCIATES by
                             MR. JAMES J. ROCHE
15                           MS. BRITTANY HARTWIG
                             642 North Dearborn
16                           Chicago, Illinois  60610

17   For the Respondent      NORTHCUTT FIRM, PC by
     Donald Szczesniak:      MR. LANCE D. NORTHCUTT
18                           MR. TIMOTHY KEISER
                             105 West Adams Street, Suite 2800
19                           Chicago, Illinois  60603

20

21

22
     Court Reporter:         GAYLE A. McGUIGAN, CSR, RMR, CRR
23                           Federal Official Court Reporter
                             219 South Dearborn, Room 2318-A
24                           Chicago, Illinois 60604
                             (312) 435-6047
25                           Gayle_McGuigan@ilnd.uscourts.gov
```

```
 1    A P P E A R A N C E S :   (Continued)

 2

 3

 4    For Joel Brodsky:        GORDON & REES LLP by
                               MR. RYAN THOMAS BROWN
 5                             MR. BRIAN M. ROTH
                               One North Franklin, Suite 800
 6                             Chicago, Illinois  60606

 7                             LOPEZ & LOPEZ LTD by
                               MR. JOSEPH R. LOPEZ
 8                             53 West Jackson Blvd., Suite 1651
                               Chicago, Illinois  60604
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1          (Proceedings heard in open court:)

 2              THE CLERK:  Case number 16 C 4182, Twyman versus S & M

 3     Auto Brokers.

 4              THE COURT:  Good morning.

 5              I think we have more than a baseball team.  Wait, two,

 6     four, six, eight.  One more.  Full team.

 7              Okay.  Please introduce yourselves.

 8              MR. BROWN:  Your Honor, Ryan Brown, counsel for Joel

 9     Brodsky.

10              THE COURT:  Okay.

11              MR. LOPEZ:  Good morning, your Honor.  Joseph Lopez,

12     counsel for Mr. Brodsky.

13              THE COURT:  Okay.  Good morning.

14              MR. ROTH:  Good morning.  Brian Roth for Joel Brodsky.

15              THE COURT:  Okay.  Good morning, folks.

16              MR. ROCHE:  Good morning, your Honor.  James Roche and

17     Brittany Hartwig on behalf of the defendants.

18              THE COURT:  Okay.  Good morning.

19              MR. MURPHY:  Andrew Murphy on behalf of plaintiff.

20              THE COURT:  Good morning.

21              MR. LUBIN:  Peter Lubin on behalf of plaintiff.

22              THE COURT:  Good morning.

23              MR. NORTHCUTT:  Good morning, your Honor.  Lance

24     Northcutt and Timothy Keiser on behalf of Donald Szczesniak,

25     who is also present in court.

1          THE COURT:  Okay.  Wonderful.  Good morning.

2          The rose between the thorns.  I have one female --

3          MR. ROCHE:  Brittany Hartwig.

4          THE COURT:  No, she said so.

5          Okay.  All right, folks.  Let's get started on this.

6          The way that this would proceed efficiently, I

7    believe, would be if we had the movant -- well, you've got

8    cross-motions, correct?

9          So I think you should give a short opening of what you

10   intend to present to support your position, and then we'll

11   start with the witness testimony.  Okay?

12         MR. BROWN:  Your Honor, I had a couple points that I

13   had discussed with Mr. Lubin -- actually, with really all the

14   attorneys here.

15         THE COURT:  Sure.

16         MR. BROWN:  And, of course, we defer to whatever you

17   would like us to do procedurally, but I think there's a couple

18   issues that may help with judicial economy today.

19         THE COURT:  Okay.

20         MR. BROWN:  We've got -- Mr. Northcutt is here.  As

21   you may recall from previous filings in the May 31st hearing,

22   there was a resolution reached between Mr. Brodsky and his

23   client, Mr. Szczesniak.  A condition of that resolution was the

24   withdrawal or striking of certain comments, certain filings,

25   with respect to Mr. Szczesniak.  That motion -- our original

1    unilateral motion was denied.  We then filed a joint renewed

2    motion that remains pending with the Court in terms of

3    resolution with him.  At the May 31st hearing, Mr. Northcutt

4    was in Ireland and his partner was here.  I thought we had said

5    they didn't need to be participating in this, that the issues

6    with the expert were resolved, but we would seek some

7    clarification from the Court with respect to that issue, as

8    well as how we might proceed with withdrawing, striking,

9    whatever those issues may be, to minimize some of the issues

10   today as we otherwise have resolved that directly between

11   Mr. Brodsky and the expert.

12           THE COURT:  Okay.

13           MR. NORTHCUTT:  If I may speak to that, your Honor,

14   very briefly.

15           THE COURT:  Okay.

16           MR. NORTHCUTT:  Judge, in keeping with what Mr. Brown

17   said, we had reached a tentative resolution that contemplated

18   withdrawal of the offensive filings, and we believed that that

19   would end the litigation with respect to my client.  That has

20   not occurred, so obviously this is a live ball.  And

21   Mr. Szczesniak's interests have to be and will be protected

22   here today if this proceeds to an evidentiary hearing.

23           The concern --

24           THE COURT:  Oh, that's what we are doing today.

25           MR. NORTHCUTT:  Understood, your Honor.

1          And I just wanted to clarify with the Court the

2    procedural posture, because at the last hearing we were told

3    that Mr. Szczesniak would not have to appear.

4          We brought him here today out of an abundance of

5    caution.

6          And we just wanted to make sure that we understand

7    where our role is in this right now.

8          THE COURT:  Okay.  So I think that I was clear about

9    this last time you were in front of me.

10          Your negotiations and your settlement can certainly

11    mitigate the damages to each other, and they have, I assume,

12    and the motions to withdraw documents are currently pending,

13    but you have forgotten the most important thing that I

14    mentioned:

15          It is the integrity of the court that I am protecting

16    in a contempt proceeding.  And when those motions are filed,

17    regardless of whether you try to mitigate that damage later,

18    those still have been filed in my courtroom and potentially

19    have abused the process and the integrity of the court.  And

20    this proceeding is to determine whether false filings were

21    made, false accusations were made, what level of degree those

22    accusations are.

23          The fact that they are later withdrawn, once I set a

24    contempt hearing, is a factor that I can take into account in

25    whether the behavior is something that has been accepted by the

1   person who may have made the accusations, but it is still my

2   job to determine whether someone has violated the ethical rules

3   within my courtroom.

4           And you can't just fix it by saying we're all done, we

5   all agree it didn't happen.  If it happened, it happened.

6   Okay?

7           MR. NORTHCUTT:  Your Honor, I very much appreciate the

8   Court's guidance.

9           From our perspective, we know it happened, and our --

10   we stand ready to provide the Court with whatever information

11   would be required.

12           We stand by our earlier proclamations and concerns

13   about what happened to my client in this case.

14           Our attempt to streamline the litigation in no way

15   obviates the egregious nature of the conduct which I've

16   addressed with the Court previously.

17           THE COURT:  Okay.  So can we begin on my terms then?

18   Okay?

19           MR. BROWN:  There were two other things I had hoped to

20   raise --

21           THE COURT:  Please, go ahead.

22           MR. BROWN:  There were -- the other issue, again,

23   we're absolutely respecting the jurisdiction of the Court and

24   everything that you -- we -- and we understand that.

25           Again, in an effort to streamline some things today,

1    we had -- we have been, and I believe your Honor was privy to

2    some communications regarding the ongoing settlement

3    discussions regarding the fee issue, which, again, we

4    understand is separate and distinct from the 1927 issues --

5              THE COURT:  Right.

6              MR. BROWN:  -- that are presented here.

7              We -- along those lines, I think we continue to

8    believe, with defendant here and with Mr. Lubin, that we likely

9    can resolve those fee issues through some sort of mutual

10   compromise;

11             But, again, if your Honor would like to hear testimony

12   with respect to those fees, things along those lines today --

13   we had hoped to not contemplate that --

14             THE COURT:  I don't think the fee issue is an issue

15   for me.

16             MR. BROWN:  Okay.

17             THE COURT:  The issue, again, goes back to simply

18   whether false statements and unethical behavior occurred in my

19   courtroom during my watch.  Period.

20             MR. BROWN:  Okay.

21             THE COURT:  That's what I'm looking into.

22             Your actions as parties in resolving that later and

23   who gets paid what is all in your court, and it is much more of

24   a concern, and you've done some significant progress, made some

25   significant progress in resolving your issues, but that doesn't

1    mean I have -- my work is not complete.

2         MR. BROWN:  And, your Honor, can we have maybe five

3    minutes to talk -- Mr. Lopez was -- there were some issues with

4    traffic in terms of getting here.

5         THE COURT:  Absolutely.

6         Let me ask you a question.  Are any of you going to be

7    presenting evidence, documents, by way of my court system?

8         MR. BROWN:  We have no intention of doing that.

9         THE COURT:  Any of you?

10        MR. LUBIN:  Yes.

11        THE COURT:  Do you know how to do it, Mr. Lubin?

12        MR. LUBIN:  No.

13        THE COURT:  Okay.  So I'm going to call up the court

14   AV guy, whatever he's called, and see if he can talk with you,

15   because we want --

16        MR. LUBIN:  Oh, no, AV -- I thought -- we were going

17   to submit our exhibits afterwards into the file.  We're not

18   going to use --

19        THE COURT:  You're not going to use the system.

20        MR. LUBIN:  No.

21        THE COURT:  Okay.  Even the document camera?

22        MR. LUBIN:  No, we just -- I haven't used it here

23   before, so I wasn't -- we just -- we had -- we just brought

24   some exhibit books that we're going to give people --

25        THE COURT:  Okay.  Fair enough.

1          All right.  I'll give you -- you need a few minutes,
2    Mr. Lopez, with your client?
3          MR. LOPEZ:  Yes.
4          THE COURT:  How long do you need?
5          MR. LOPEZ:  Five minutes?
6          THE COURT:  That's fine.
7          MR. LUBIN:  Judge, there was one thing I had resolved
8    with opposing counsel.
9          We did serve Mr. Brodsky with a Rule 11 letter.  It
10   was actually attached as Exhibit F to our first sanctions
11   motion, so there's no factual dispute about that.
12         THE COURT:  I don't know where that came from out of
13   the blue --
14         MR. LUBIN:  They filed -- a filing they filed
15   yesterday saying --
16         THE COURT:  Okay.
17         MR. LUBIN:  I just wanted, since it's a predicate
18   issue for Rule 11, I just want to make sure that --
19         THE COURT:  Okay.  You acknowledge that?
20         MR. BROWN:  We acknowledge that.
21         THE COURT:  All right.  Let's go then.  I'll give you
22   a break.
23         LAW CLERK:  All rise.  Court is in recess.
24      (Recess taken from 9:16 a.m. to 9:27 a.m.)
25         THE COURT:  Okay, please be seated.  Are you ready to

Opening Statement - Mr. Murphy

1    begin?

2              All set, Mr. Lopez?

3              MR. LOPEZ:  Yes.

4              THE COURT:  Okay.  Let's go.

5              MR. BROWN:  Your Honor, as an initial point, we -- I

6    spoke with Mr. Lubin.  We would make an oral motion to withdraw

7    our motion for sanctions.  We don't have any intention of

8    presenting any evidence to the Court in relation to our

9    motions -- our motion for sanctions.

10             THE COURT:  Okay.  All right.  I'll grant your oral

11   motion to withdraw sanctions against the other side.

12             Who is going to do an opening here?

13             MR. MURPHY:  I am, your Honor.

14             THE COURT:  All right.  Everybody else can sit.

15             MR. LUBIN:  Thank you, your Honor.

16             MR. NORTHCUTT:  I will also be, your Honor.

17             THE COURT:  That's fine.  I'll give you a moment.

18             MR. MURPHY:  Good morning, your Honor.

19             THE COURT:  Good morning.

20   <u>OPENING STATEMENT BY MR. MURPHY</u>:

21             MR. MURPHY:  Plaintiff's motion for sanctions does not

22   concern just a single offhanded comment or advancing a single

23   baseless position.  Rather, plaintiff's motion involves

24   Mr. Brodsky's pattern of uncivil behavior, including personal

25   attacks against plaintiff's counsel, Mr. Lubin.

Opening Statement - Mr. Murphy

1        These personal attacks are included in more than 16

2    different pleadings and just as many emails that span the

3    entirety of this case.

4        Plaintiff's motion also concerns Mr. Brodsky's

5    calculated strategy of uncooperativeness throughout this case,

6    where even the most routine matters and scheduling issues

7    required numerous emails and telephone calls and invariably

8    motion practice, having -- tasking the Court with having to

9    resolve issues that the attorneys should have easily been able

10   to resolve between themselves.

11       We are here because Mr. Brodsky filed several

12   frivolous motions and advanced several baseless arguments that

13   had no basis in law and, in fact, were contrary to established

14   law.

15       And, most importantly, we're here because Mr. Brodsky

16   made several misrepresentations to this Court, either by

17   outright misstating the facts or by making accusations and

18   asserting them as if they were facts when there was absolutely

19   no basis for those accusations.

20       Focusing for a moment just on the uncivil behavior,

21   incivility is not a litigation tactic.  It is not a tool of

22   zealous advocacy.  Incivility denigrates the legal profession.

23   And because attorneys are officers of the court, it denigrates

24   the Court itself.

25       Beyond that, incivility needlessly increases the cost

Opening Statement - Mr. Murphy

1   of litigation.

2           The Seventh Circuit's report on civility opened with

3   the observation that when a lawyer behaves uncivilly,

4   contentiously opposing everything his opponent proposes, both

5   litigants suffer because they must pay even higher attorney

6   fees and the disposition of the case is delayed.

7           Fleshing this out, the Seventh Circuit went on to

8   explain that a lack of civility and Rambo-like litigation

9   tactics drive up attorney's fees and, more importantly, they

10  add to the burden of an already overburdened judicial system

11  and waste judicial time by having to resolve issues that the

12  parties should be able to have resolved themselves.

13          The Court has a number of tools at its disposal to

14  combat this incivility, including Rule 11, Section 1927, Rule

15  30, and the Court's own inherent powers.

16          In this case, time and time again Mr. Brodsky took the

17  spotlight off of the parties' dispute and the merits of this

18  case to turn it onto Mr. Lubin personally.

19          These barrages of personal attacks against Mr. Lubin,

20  again, as I said, wasn't just a single instance or wasn't in a

21  single pleading, but was repeated over and over and over again

22  in a number of pleadings throughout the case.  And the kicker

23  is that the vast majority of these personal attacks came after

24  this Court entered an order warning Mr. Brodsky that further

25  uncivil comments would be the basis for sanctions.

Opening Statement - Mr. Murphy

1      Mr. Brodsky made a conscious decision to disregard the

2  Court's warning and continue his attack on Mr. Lubin.

3      Examples of these personal attacks include sending an

4  email in which Mr. Brodsky said to Mr. Lubin, "How can you even

5  call yourself a lawyer?  You are an embarrassment to the

6  profession."

7      And less the Court think that this was just an email

8  that was in response to a hostile exchange, this email came in

9  response to an innocuous email about requesting to schedule a

10  deposition.

11      In another ten pleadings and emails, perhaps more,

12  Mr. Brodsky called Mr. Lubin an extortionist.  Mr. Brodsky

13  falsely accused Mr. Lubin of running a criminal enterprise and

14  conspiring with plaintiff's expert, Donald Szczesniak, to

15  fabricate a case and evidence against defendant.  And time and

16  time again, Mr. Brodsky repeated these accusations in

17  pleadings, in emails, and even at a deposition.

18      Mr. Brodsky repeatedly referred to Mr. Lubin as a liar

19  and accused him -- falsely accused him of engaging in a fraud

20  on the court, including making false and wild accusations that

21  Mr. Lubin made up individuals and submitted false affidavit

22  testimony on behalf of those individuals.

23      Mr. Brodsky accused Mr. Lubin of being obsessed with

24  this case and implied that the reason for his obsession was

25  that his law practice was failing.

Opening Statement - Mr. Murphy

1        And Mr. Brodsky did not constrain his contempt just to

2    Mr. Lubin, but also sent mocking and abusive emails to

3    Mr. Lubin's support staff.

4        This vicious style of litigation, these *ad hominem*

5    attacks, have no place in the practice of law.

6        These personal attacks came to dominate this case to

7    the point where plaintiff's counsel was spending more time

8    trying to disprove baseless accusations of fabricating evidence

9    and engaging in a criminal enterprise than it was litigating

10    the merits of plaintiff's claims.

11        And this Court should not be lulled into believing

12    that this is just an isolated incident, that Mr. Brodsky's

13    behavior in this case, as has been suggested, is the result of

14    a long-running feud with Mr. Lubin.  Plaintiff has submitted

15    evidence that the way Mr. Brodsky has acted in this case and

16    the way Mr. Brodsky has treated Mr. Lubin in this case is how

17    Mr. Brodsky litigates all cases and how Mr. Brodsky treats all

18    opposing counsel.

19        Mr. Brodsky's incivility has gotten him disqualified

20    in at least one instance in another case, and that did not even

21    deter him as the exhibits and the letters and emails that

22    plaintiff has introduced into the record establish.  In other

23    cases, Mr. Brodsky engages in similar type of behavior.

24        In one case, Mr. Brodsky sent opposing counsel a

25    letter where he mocked the other attorney's supposed drinking

Opening Statement - Mr. Murphy

1    problem and marital problems.  In that letter, he also made

2    homophobic comments and accused the attorney of having

3    homoerotic feelings for his client.

4           In another case --

5           THE COURT:  And what did the judge in that case do

6    about that?

7           MR. MURPHY:  I do not know.

8           THE COURT:  What court was that?

9           MR. MURPHY:  It was the state court, I know that.

10          THE COURT:  Okay.

11          MR. MURPHY:  In another case, Mr. Brodsky referred to

12   opposing counsel as a fat, obnoxious slob in one email, and

13   stupid and obnoxious in another email.  And in that same case,

14   Mr. Brodsky repeatedly mocked another attorney's weight

15   referring to him as obese and out of shape and fat, drunk, and

16   stupid in a series of emails.

17          THE COURT:  And what did the judge in that case do?

18          MR. MURPHY:  Again, I'm not sure what the resolution

19   in that case was.

20          THE COURT:  But there's no findings of any misconduct

21   or violations of Rule 11 in those two cases that you just

22   mentioned?

23          MR. MURPHY:  Again, I don't know -- and the reason --

24   apparently, he was reported to the ARDC in one of those

25   instances.

Opening Statement - Mr. Murphy

1          THE COURT:  By the judge.

2          MR. MURPHY:  Yes.

3          The reason for bringing up those instances is to, one,

4   dispel any notion that this is -- these comments in this case

5   and the uncivil behavior in this case is simply because of a

6   conflict between Mr. Lubin and Mr. Brodsky, but also to

7   demonstrate that the need for the Court to sanction Mr. Brodsky

8   for his conduct in this case, to deter him from continuing such

9   conduct in future cases.

10         But beyond uncivil behavior, Mr. Brodsky engaged in

11  other vexatious behavior that multiplied the proceedings and

12  drove up attorney's fees --

13         THE COURT:  So let me just stop you with your opening.

14         So this uncivil behavior that you've just outlined,

15  are you saying it's a Rule 11 violation or also a violation of

16  1927 and Rule 30?

17         MR. MURPHY:  The personal attacks on Mr. Lubin?

18         THE COURT:  Precisely.

19         MR. MURPHY:  It would be a violation of Rule 11, also

20  1927, and within the Court's inherent powers --

21         THE COURT:  Okay.

22         MR. MURPHY:  -- but more likely Rule 11 and Section

23  1927.

24         THE COURT:  Okay.  Thank you.

25         MR. MURPHY:  The other examples of vexatious behavior

Opening Statement - Mr. Murphy

1    in this case include inappropriate behavior at a deposition in

2    which Mr. Brodsky repeatedly swore, improperly coached the

3    witness and made speaking objections, instructed the witness

4    not to answer on multiple occasions, and even stopped the

5    witness mid-answer and instructed him to stop an answer when he

6    believed that the witness had said enough or was saying

7    something he didn't want to be said.  He also instructed the

8    witness to disregard a document subpoena.

9         Mr. Brodsky also refused to verify interrogatory

10   answers early on in the case.  And even after plaintiff's

11   counsel sent Mr. Brodsky the case law and the text of the rule

12   establishing the need to verify interrogatory answers,

13   Mr. Brodsky persisted in refusing to verify the interrogatory

14   answers, forcing plaintiff to file a motion to compel in order

15   to obtain that verification.

16        As I touched on briefly earlier, Mr. Brodsky refused

17   to schedule depositions, would not respond to emails or to

18   telephone calls, and forced plaintiff to file multiple

19   different motions to extend the deposition cut-off date so that

20   these depositions could be scheduled and ultimately taken.

21        Mr. Brodsky also filed multiple frivolous motions and

22   advanced baseless arguments.  Included among these frivolous

23   filings was defendant's motion to strike plaintiff's local Rule

24   56.1 statement of facts and request for sanctions.  This is

25   Docket 128, and the reply to that, which is Docket Number 135.

Opening Statement - Mr. Murphy

1    In this motion, Mr. Brodsky demonstrated a lack of

2    understanding for the summary judgment procedure in federal

3    court.  He accused plaintiff's counsel of sandbagging because

4    they filed a local Rule 56.1 statement of facts in connection

5    with their response to a motion for summary judgment, as is

6    required by local Rule 56.1.

7    Even worse, Mr. Brodsky requested sanctions against

8    plaintiff's counsel because plaintiff's local Rule 56.1

9    statement of facts had a typo in the title and errantly

10   referred to it as a local Rule 56.1(C) statement of facts

11   instead of a local Rule 56.1(b)(3)(C) statement of facts.  And

12   what's worse is that Mr. Brodsky requested sanctions under Rule

13   56(h), even though Rule 56(h) had nothing to do with the issues

14   and was completely inapplicable, as Rule 56(h) involves

15   sanctions for filing false affidavit testimony.

16   Another frivolous pleading included defendant's

17   opposition to plaintiff's motion for leave to file a corrected

18   affidavit.  Plaintiff sought to file a corrected affidavit

19   correcting a typo in its expert, Mr. Szczesniak's, declaration,

20   and Mr. Brodsky opposed this rather innocuous motion on

21   frivolous grounds, such as the fact that the declaration

22   testimony, quote, has not been subject to cross-examination.

23   The brief was largely non-responsive to plaintiff's actual

24   motion, instead, was just an opportunity to rant about

25   Mr. Szczesniak and attempt to poison the Court against him.

Opening Statement - Mr. Murphy

1    Defendant also filed a motion to seal audio file

2  relating to the audio file of Mr. Hasan's deposition.

3  Mr. Brodsky argued in that motion that plaintiff's filing of

4  the audio recording was, quote, wrongful and unauthorized,

5  despite the fact that the Court had granted plaintiff's motion

6  to file that audio tape and even instructed defendant to file

7  its own copy of the audio filing.

8    THE COURT:  To be heard *in camera*, not publicly.  I

9  mean, that was the order, which is -- my order was that I could

10  take it in and review it *in camera*.  Just for the record, I'm

11  clarifying the completeness of the order.

12    MR. MURPHY:  Okay.  And in that motion, Mr. Brodsky

13  cited a case and represented to the Court the case stood for

14  the fact that audio recordings should not be filed as part of

15  the judicial record.  But, in fact, that case did not stand for

16  that proposition.  The issue in that case was determining what

17  information the public presumptively had a right of access to,

18  and the case held that access to a transcript satisfies the

19  public's right of access, and that there's no presumptive right

20  to both the transcript and the underlying audio file.  It did

21  not say that audio files should never be filed as part of the

22  judicial record.

23    And, finally, another example of a frivolous filing

24  was defendant's motion for sanctions against Mr. Szczesniak.

25  In that motion, Mr. Brodsky requested sanctions against

Opening Statement - Mr. Murphy

1  Mr. Szczesniak for sending an anonymous fax, which he claimed

2  that came from Mr. Szczesniak.  And Mr. Brodsky supported that

3  argument with affidavit testimony based purely on speculation,

4  which Mr. Brodsky knew or should have known that speculation is

5  never competent evidence or proper affidavit testimony.

6        Also, Mr. Brodsky advanced the position that

7  plaintiff's counsel's failure to fire Mr. Szczesniak upon

8  learning of defendant's accusations against him was

9  sanctionable conduct, without citing any authority or any case

10  law that would support that that -- that plaintiff's counsel

11  had an obligation to do that.

12        This behavior unquestionably increased the litigation

13  cost in this case.  By filing these baseless motions,

14  Mr. Brodsky forced plaintiff's counsel to do the research that

15  Mr. Brodsky should have done before advancing these motions and

16  required plaintiff to file responses to these motions outlining

17  for the Court why the positions were baseless and contrary to

18  established law.  And, more importantly, by filing these

19  baseless motions, Mr. Brodsky burdened the Court with having to

20  resolve motions that a reasonable attorney would have never

21  brought in the first place.

22        One need look no further --

23        THE COURT:  Or, more importantly, that we were not

24  dealing with the issues of the case at all.

25        MR. MURPHY:  Exactly, your Honor.  It was an attempt

Opening Statement - Mr. Murphy

1   to spawn satellite litigation and to turn an auto fraud case

2   into some kind of criminal proceeding against Mr. Szczesniak,

3   and repeated requests for litigation -- or for sanctions

4   against Mr. Lubin, so far afield from litigating the merits of

5   the case that it was completely unnecessary.

6          And we need look no further than the docket in this

7   case.  In a case that Mr. Brodsky repeatedly referred to as a

8   small claims case, the current number of docket entries is 208.

9   Among these 208 docket entries, we find that Mr. Brodsky filed

10  14 different motions, including multiple motions for protective

11  orders, each one which the Court denied.

12         Mr. Brodsky requested sanctions against Mr. Lubin no

13  fewer than nine times.

14         And 48 of these entries, nearly a quarter of the

15  docket entries, are filings by plaintiff directly related to

16  Mr. Brodsky's improper conduct, such as having to file multiple

17  motions to compel which the Court granted, or filing responses

18  to these baseless motions by Mr. Brodsky explaining why the

19  motion was baseless and the case law that held that

20  Mr. Brodsky's position was baseless.

21         Now, these are just a summary of some of the

22  sanctionable behavior that has occurred in this case, and I

23  could go on and on and on and on, but I won't.

24         Instead of going through each pleading and pointing

25  out each sanctionable statement or baseless argument, we've put

Opening Statement - Mr. Murphy

1   together a book of exhibits that contains in it a table.  And

2   the table has the title of the sanctionable pleading, the

3   docket number, and then it quotes the specific language

4   statements in each pleading or the specific frivolous argument.

5           And if we could present this to the Court.

6           THE COURT:  That's fine.

7       (Tendered.)

8           MR. LOPEZ:  Do you have a copy for us?

9           MR. MURPHY:  Yes.

10          MR. LOPEZ:  Thanks.

11          MR. MURPHY:  And as I said, this table goes through

12  more in-depth than the presentation I made here every single

13  sanctionable pleading and the specific statements in them,

14  because many of the personal attacks were repeated in multiple

15  pleadings.

16          THE COURT:  So what are you going to present to

17  support your version of the factual dispute here?

18          MR. MURPHY:  Yes.  The majority of the sanctionable

19  conduct we will not be presenting testimony because it's all

20  contained in the actual pleadings themselves.  However, we will

21  be presenting two witnesses for two specific facts.  We'll be

22  presenting Mr. Lubin, who will be testifying that the

23  accusations that he fabricated -- made up individuals and

24  submitted fabricated affidavit testimony to the Court is false.

25  And also he will be presenting testimony that the accusations

Opening Statement - Mr. Murphy

1    of engaging in a criminal enterprise and a conspiracy with

2    Mr. Szczesniak to fabricate a case were also false.  And he

3    will be testifying to the basis that he had for filing the case

4    and for supporting the accusations in the complaint.

5            THE COURT:  Okay.

6            MR. MURPHY:  And the second witness will be

7    Mr. Szczesniak, who will testify largely to the same thing,

8    that he was not engaged in any type of criminal enterprise and

9    did not fabricate any witnesses.

10           For instance, one of the accusations is that

11   Mr. Szczesniak made up a son, Luke, who submitted an affidavit,

12   and Mr. Szczesniak will be testifying that he, in fact, has a

13   son Luke.

14           THE COURT:  Okay.  So this set of exhibits, did you

15   file it on the record?

16           MR. MURPHY:  It has not.  We would ask that we be

17   allowed to file it.

18           THE COURT:  Well, it's going to need to be electronic,

19   not just in this hard copy form.

20           MR. MURPHY:  Yes, your Honor.

21           MR. LUBIN:  We can have our staff do that.  I can call

22   them up.  I told them to be ready to do that.  Would you like

23   them to do that today --

24           THE COURT:  It should be on the record so that it --

25   yeah, every filing in the court hearing has to be on the

Opening Statement - Mr. Northcutt

1    record.

2              MR. LUBIN:  I'll call my staff up when we have a break

3    and I'll take care of it.

4              THE COURT:  Are you done?

5              MR. MURPHY:  Yes, your Honor.

6              THE COURT:  Thank you very much.

7              Mr. Northcutt, are you ready, sir?

8    OPENING STATEMENT BY MR. NORTHCUTT:

9              MR. NORTHCUTT:  Yes, your Honor.

10             To state the obvious, an order from a federal court is

11   not a party invitation.  It's not a polite suggestion.  It is a

12   directive that carries the force of law and the sure penalty

13   that if you disobey the will of a federal judge, there are

14   consequences.  That's true whether it's an order specific to a

15   case or general orders of the Court that all of us who cross

16   this threshold are bound by.

17             This case and this attorney has turned what was

18   supposed to be a straightforward proceeding into an

19   out-of-control clown car.

20             The Court had made perfectly clear at the onset of

21   this litigation when these tactics began to unearth from

22   Mr. Brodsky that the parties are warned to eliminate vitriolic

23   filings.  That was the order of the Court.  That order was

24   ignored.  And Mr. Brodsky wove together a mosaic of lies with

25   one thing and one thing only in mind:  To get the result that

Opening Statement - Mr. Northcutt

1  he wanted by engineering the withdrawal of the plaintiff's

2  expert, my client, Donald Szczesniak.

3      What makes this more egregious, your Honor, is, if we

4  even put a pin in the incivility -- and that's a polite way of

5  characterizing it.  It wasn't incivility.  It was piggish

6  behavior that is something you would expect from children, not

7  from officers of the court.

8      THE COURT:  So it's your theory that all of the

9  aggressiveness, the vitriol, and the Rule 11 alleged violations

10  were being orchestrated in order to hurt the case, in that if

11  he could get your client, who was the expert in this underlying

12  car case, off of the case, then he would be in a better

13  situation, either bargaining or to win his side, correct?

14      MR. NORTHCUTT:  Precisely, your Honor.

15      THE COURT:  All right.

16      MR. NORTHCUTT:  And this is something that is not just

17  a theory that we are weaving together; this is supported in the

18  record, and it's supported in what Mr. Brodsky himself said.

19      Point after point, Mr. Brodsky made the argument that

20  Mr. Szczesniak should not be the expert for the plaintiff.

21      Mr. Szczesniak is a respected, renowned expert in his

22  field.  He was here to offer his testimony.  And if there were

23  any legitimate basis to question his qualifications, his

24  opinions, the bases on which he formed these opinions, there is

25  a forum for doing that.

Opening Statement - Mr. Northcutt

1      Instead, what he did was ask this Court to use the
2  power of a federal judge to have him charged with a crime.  I
3  have never seen that.
4      THE COURT:  You mean the motion where he requested
5  that I have him arrested and turned over to the U.S. Attorney's
6  Office?
7      MR. NORTHCUTT:  Absolutely.  Now, of course, there was
8  no legal basis to do that.  There was absolutely no way in
9  which it could even procedurally happen.  But he did it to
10  scare Mr. Szczesniak out of this case.  When the Court rejected
11  that, he doubled down and basically asked for the same set of
12  relief through the vehicle of a sanctions motion.  And, again,
13  this was woven together by lies.  He brought in multiple
14  instances of extraneous matter that had absolutely nothing to
15  do with this case, for one reason only:  To send the message
16  that if you stay in this litigation, I'm going to make it so
17  costly and so embarrassing for you and throw out so many
18  accusations that the sheer volume of vitriol will overcome your
19  ability to testify in this case.
20      So Mr. Szczesniak, who is an expert, had to go out --
21      THE COURT:  In what field?
22      MR. NORTHCUTT:  He's an expert in multiple fields
23  regarding the automotive industry, the valuation of cars, in
24  customs and practice within that industry.  And that was the
25  scope and purpose for which his testimony was called in this

Opening Statement - Mr. Northcutt

1    case.

2            THE COURT:  Did the defense at any time file a *Daubert*

3    motion to challenge his expertise --

4            MR. NORTHCUTT:  Never.

5            THE COURT:  -- under the Rule --

6            MR. NORTHCUTT:  Never.

7            THE COURT:  -- 702?

8            MR. NORTHCUTT:  No, Judge.  This was not a legitimate

9    attack on an expert's qualifications.

10           He drudged up a number of completely disjointed, false

11   accusations that were leveled at Mr. Szczesniak, claimed they

12   were crimes, and then doubled down and claimed that he was

13   committing more crimes to this Court.

14           And let's make no mistake.  If any of this stuff were

15   true, the Court should have thrown Mr. Szczesniak in a prison

16   cell long ago.  But these were lies.  Not miscalculations.

17   These were deliberate, telegraphed lies.

18           And the only thing that went wrong with his plan that

19   Mr. Brodsky had put in place is Mr. Szczesniak had the

20   wherewithal and the loyalty to his client and his own

21   reputation to fight through this.  And even today he's having

22   to hire a lawyer to stand up in front of a federal court and

23   say he's not a criminal.  That is obscene.  And Mr. Brodsky has

24   brought us to that point.

25           So today we are going to present testimony, because we

Opening Statement - Mr. Northcutt

1  have to, and because to the Court's point, the integrity of

2  this process has to be preserved, and I, like any lawyer, is

3  obliged to the Court.

4         So Mr. Szczesniak is going to say that, no, he didn't

5  forge a doctor's note; no, he did not invent a son; no, he

6  didn't threaten an old lady in downstate Illinois.  All of that

7  humiliating testimony is going to have to come out to state the

8  obvious:  That the only person who has committed any acts of

9  malfeasance or misrepresentation to the Court is Mr. Brodsky.

10        When this is all over, your Honor -- and from my part,

11 I hope to truncate these proceedings so we can give the Court a

12 flavor and a general overview of the falsity of the allegations

13 without diving into each and every rabbit hole Mr. Brodsky has

14 brought up and without litigating each and every case, which

15 would take days, if not weeks.

16        THE COURT:  However, the accusations that he filed in

17 the affidavit, I need to have specific refutations on the

18 record if that is what you are saying are the false statements

19 that would lead to a finding of contempt.  So I don't need you

20 to go down every rabbit hole, but you absolutely must refute

21 those specific statements that you believe are false, are lies,

22 as you've just said.

23        MR. NORTHCUTT:  We intend to do that, your Honor, and

24 we will do that in a way that hopefully can address them in a

25 global way --

Opening Statement - Mr. Northcutt

1          THE COURT:  Quick, truncated fashion.

2          MR. NORTHCUTT:  Exactly.

3          THE COURT:  Okay.

4          MR. NORTHCUTT:  I don't wish to belabor the Court --

5          THE COURT:  All right.

6          MR. NORTHCUTT:  -- with having to re-litigate entire

7     cases.

8          THE COURT:  Okay.

9          MR. NORTHCUTT:  We will do that.  And certainly we

10     would welcome the Court's guidance if there is any ambiguity as

11     to our presentation.

12          THE COURT:  Okay.

13          MR. NORTHCUTT:  However, what I would draw the Court's

14     attention to, and throughout these proceedings, is the question

15     of will there truly be any sort of acceptance of responsibility

16     for the harm that he has caused, for the human anguish he has

17     caused.

18          THE COURT:  Well, what about the fact that he settled

19     with you and he wants to withdraw the accusations?

20          MR. NORTHCUTT:  I would defer judgment, from my own

21     perspective, your Honor, as to how these proceedings are

22     conducted.

23          He's going to take the witness stand.  If we are going

24     to hear from the other side that, no, maybe, in fact, he did

25     invent a son or maybe he did conspire with a lawyer, then I

Opening Statement - Mr. Northcutt

1    think that that changes the complexion entirely.

2         The other thing I would like to draw to the Court's

3    attention is immediately after the settlement -- and I have to

4    sing the praises of Mr. Brown, who, since he became involved in

5    this case, and even though we are adverse, has been nothing but

6    a consummate professional in trying to streamline the

7    litigation and address the concerns of the Court in a

8    professional manner.  And he is my opponent.  That's the way

9    it's supposed to work.  You can fight like cats and dogs, but

10   you don't fight like uncivil children.  That's what he has

11   done.  And that's the finest tradition of this Court.

12        But since that tentative settlement -- which cannot

13   reach fruition if these pleadings are still out there for all

14   to read -- since that settlement, there has been nothing but

15   more vitriol coming from Mr. Brodsky by virtue of Mr. Lopez,

16   who made the statement in court that -- I'm sorry, in the

17   press, that, Oh, this isn't really anything, it's just

18   effectively an overly sensitive federal judge because

19   Mr. Brodsky is used to Cook County judges where there are no

20   rules.

21        He is doubling down on the same type of behavior that

22   Mr. Brodsky has gotten away with before, and he is impugning

23   the integrity and the ability of this Court.

24        And so if that is going to be the flavor of the day,

25   if we are going to hear more of that, if my client is going to,

Opening Statement - Mr. Brown

1    after having to come in here at his own expense, be subjected

2    to more of these baseless accusations, then there is no

3    settlement.  And the tenor of our position as to what should

4    happen to Mr. Brodsky, we will defer to the Court.

5            THE COURT:  Just understand, I have nothing to do with

6    your settlement.  I have nothing to do with your negotiations.

7    That is not what I'm doing here today.  I repeat that.  This is

8    not a consideration of the Court's.  So if there's any

9    discussion of whether a settlement is coming or going, that's

10   not my issue.  All right?

11           MR. NORTHCUTT:  Perfectly understood, your Honor.

12           THE COURT:  Who would like to respond?  Mr. Brown or

13   Mr. Lopez, would you like to say a few words before we begin

14   with the evidence?

15           MR. BROWN:  Yes, your Honor.

16           THE COURT:  At least you had a nice compliment, sir.

17           MR. BROWN:  Thank you, your Honor.

18   OPENING STATEMENT BY MR. BROWN:

19           MR. BROWN:  In truth, I've spoken at length with

20   Mr. Lubin --

21           MR. LUBIN:  He is a consummate professional --

22           THE COURT:  Okay.  It's his turn now.

23           MR. BROWN:  And we have tried to work through these

24   issues, and we've worked through a number of issues,

25   recognizing there was always this issue that we would have to

Opening Statement - Mr. Brown

1    address, your Honor.

2         And, again, going back to my initial comments, our

3    goal is, in an effort to truncate today, showing some

4    contrition and humility, acknowledging further to -- we filed a

5    response yesterday.

6         There's a few points -- while I believe that short

7    response speaks for itself, there's a few points I'd like to

8    mention.

9         I don't believe that this was calculated or conscious.

10   I don't believe that there was something designed in this

11   instance to get the expert out of the case.  I don't believe

12   this is a case where Joel Brodsky did something to drive up his

13   own fees and expand the litigation.  I truly do believe there's

14   an aspect -- a heavy aspect of this case is a conflict of

15   personalities.

16        THE COURT:  Okay.  More than just driving up his own

17   fees, the accusation is that by making these false accusations,

18   he would intimidate and weaken the plaintiff's case in order to

19   win his case, essentially.  So that's, essentially, their

20   theory of his intent in doing this.

21        MR. BROWN:  And, again, from a bad faith standpoint in

22   terms of consciously doing those things, I don't believe that's

23   true.  But at the same time, I think that's a determination for

24   the Court --

25        THE COURT:  Okay.

Opening Statement - Mr. Brown

1          MR. BROWN:  -- when reviewing the totality of filings

2     and circumstances.  I believe --

3          THE COURT:  So do you --

4          MR. BROWN:  -- there is a conflict of personalities.

5          THE COURT:  And that's what triggered this aggressive

6     interaction between the parties?

7          MR. BROWN:  Joel is who he is.  And he is a wonderful

8     lawyer for a lot of clients, and a lot of clients depend upon

9     Joel Brodsky, especially in the criminal context.

10         And as I've gotten to know him and as I've spoken with

11    Mr. Lopez about cases that Joel is involved in, I believe he is

12    important in our system in terms of an advocate generally for

13    criminal defendants.  Very important.

14         I think in this instance, I think he had some

15    particularly intense cases going on at the same time as this.

16         I think -- no offense to Mr. Lubin, I think my

17    interactions with him have been very positive -- I think

18    there's -- there was a little blind spot on both ends between

19    maybe a blue collar lawyer and an Ivy League lawyer where they

20    didn't always speak the same language and he took offense at

21    certain things, and I think that led to certainly some

22    heightened sensitivities and some real aggression in this case.

23         All of that being said, it's never appropriate,

24    whether used as hyperbole or not, to say it's a criminal

25    enterprise, to claim that Mr. Szczesniak is a criminal.  He's

Opening Statement - Mr. Brown

1    not.  He's not.  And that -- if they want to provide that

2    testimony, that's fine.  If they have statements, we'll

3    stipulate to them.

4               THE COURT:  Okay.

5               MR. BROWN:  We understand what they're going to say.

6    We've had those discussions.  And to, again, truncate the

7    proceeding, I'm happy to look at those.

8               There's a couple things with respect to the -- the

9    only other point that I have -- and, again, I don't want to get

10   at a granular level, I would prefer to avoid that, recognizing

11   that your Honor has to look at some of the statements that were

12   made -- there's one issue with respect to Mr. Szczesniak that I

13   think we can agree.  There was a police report filed by this

14   third-party individual.  I -- that's the only piece of

15   evidence, as we originally didn't plan on presenting any.  In

16   the context of that, I would simply want to have that police

17   report referencing -- whether there's false --

18              THE COURT:  All right.  We'll discuss that as an

19   exhibit to be filed for the defense, if you have it.  We'll

20   discuss it later.

21              MR. BROWN:  But, otherwise, I do agree with opposing

22   counsel that I think the record itself --

23              THE COURT:  Is sufficient for me to review?

24              MR. BROWN:  -- is sufficient for you to review.

25              THE COURT:  Okay.  All right.  Thank you very much,

Opening Statement - Mr. Lopez

1   Mr. Brown.

2           Mr. Lopez, did you want to say anything, sir?

3   OPENING STATEMENT BY MR. LOPEZ:

4           MR. LOPEZ:  Judge, I really don't have too much to

5   say.  I got into the case kind of late, and I've reviewed most

6   of the documents in this case.  And, again, I agree with Mr.

7   Brown.  I think a lot of this occurred because Mr. Brodsky and

8   Mr. Lubin's personalities were diametrically opposed

9   completely, and it resulted in frustration from Mr. Brodsky.

10          I think one of the things that Mr. Brodsky may not

11  have realized is that Mr. Lubin, being a lemon lawyer, so to

12  speak, is engaged in a lot of these cases and a lot of these

13  cases are pending.  And when Mr. Brodsky looks at this and

14  Mr. Lubin's practice and how it's affecting his client, he

15  believes -- he believes Mr. Lubin was out there taking these

16  cases and creating more attorney's fees than necessary, and he

17  was fighting with him in regard to this.  This was about a car

18  that was involved in a crash.  We know about that.  And it was

19  sold at an auction, was purchased by Mr. Brodsky's clients.

20  And there was really never any -- I guess there was really --

21  the car was never -- the car was driven for 25,000 miles, and

22  Mr. Brodsky felt that his clients were being unnecessarily

23  targeted under this particular set of circumstances, because

24  the car appeared to run fine, there weren't any mechanical

25  issues, there were no warranty issues, and he believed it

Opening Statement - Mr. Lopez

1   was -- he believed, because of the condition of this particular

2   vehicle -- many vehicles are sold at auction that are basically

3   two cars welded back together and have all kinds of issues, and

4   those are the types of issues that Mr. Brodsky believes are

5   more appropriate for this type of litigation.

6           So starting with that, I think he was overzealous, and

7   I think that Mr. Lubin's pleading is correct, that he engaged

8   in Rambo-like tactics, that he was just overzealous in this

9   particular case because he was trying to protect his client.

10  And this was about his client, and he went way over the top to

11  protect his client.  Mr. Brodsky did everything he could to

12  protect his client, even engaging in what the Court has found

13  to be uncivil conduct.  And I think that's one of the things

14  that the Court can take into consideration is that Mr. Brodsky

15  really felt that he was servicing his client appropriately and

16  protecting his client appropriately, even though the Court

17  found that some of these motions were frivolous and maybe

18  Mr. Brodsky didn't have a complete understanding of the civil

19  practice or whatever it might be.

20          But I don't really think that when Mr. Brodsky accuses

21  Mr. Lubin of being a criminal, I think he uses the wrong word.

22  I think Mr. Brodsky believed that Mr. Lubin was involved in

23  some type of racket with other lawyers.  And so what?  I mean,

24  it doesn't make it illegal, doesn't make it unethical, and it's

25  conduct that's acceptable here in court, the way that the lemon

Opening Statement - Mr. Lopez

1    lawyers practice, and that's just how it is.

2              But I think out of frustration, Joel just overreacted

3    and fought.  And when he got the police report regarding the

4    expert witness and the anonymous letter and other information,

5    I think he had a duty to bring it forward to the Court, maybe

6    not in the precise manner that he did by making a request that

7    the U.S. Attorney arrest this individual, and maybe that was a

8    little bit over the top, but I think he still had a duty to

9    bring the information onto the record because it was impeaching

10   information and it was information that he believed could

11   disqualify their expert witness.

12             So I don't think Mr. Brodsky ever intended to try and

13   destroy Mr. Lubin's reputation, so to speak, generally.  I

14   think it was just, in this particular case, back and forth.  I

15   just -- some of their emails are referring to each other by

16   first name, and there's still disparaging remarks.

17             I understand civil lawyers work differently than

18   criminal lawyers, obviously.  And many of the civil cases I've

19   become involved in lately, it just seems to be a different

20   conduct that occurs between civil attorneys that you don't see

21   between U.S. Attorneys and defense attorneys.  It's a different

22   practice.  It's about money, so the stakes are high.  And the

23   lawyers each have a personal interest in it, as opposed to the

24   other business that I'm involved in where there's no real

25   personal interest.  But when there's money involved, you know,

Opening Statement - Mr. Lopez

1   passions run high and people do things when there's money

2   involved.

3           THE COURT:  No personal interest other than one's

4   liberty?

5           MR. LOPEZ:  Yes.  But I'm just saying, as opposed to

6   these particular, you know, when a plaintiff files a lawsuit,

7   the attorney and the plaintiff want to make money, and the

8   defense wants to save money, and the defense lawyer wants to

9   try and save his client money.  It's a little bit different.  I

10  think that money just stirs more emotions sometimes.

11          But I do think -- and one thing I want the -- I think

12  the Court should take into consideration is that really

13  Mr. Brodsky -- everything he did was he believed in the best

14  interest of his client, not to harass or to delay.  He just

15  felt that these were things he needed to do to protect his

16  client from this lawsuit.

17          THE COURT:  Can you answer me a few questions?

18          First question is:  How long has he been practicing in

19  this civil area?

20          MR. LOPEZ:  Judge, he started in civil practice many,

21  many years ago.  '84?  '84, right?  In 1984.  I mean, I've

22  known Mr. Brodsky probably since the late '80s.

23          THE COURT:  Okay.  And then my second question is:

24  This concept that there was a clash of a blue collar lawyer

25  with an Ivy League lawyer, how does one even determine that in

Opening Statement - Mr. Lopez

1  litigation?  They get together and say I'm from this school and

2  I'm from this school?

3           MR. LOPEZ:  Yes.

4           THE COURT:  Where does this happen?

5           MR. LOPEZ:  I think exactly what the Court just said.

6           THE COURT:  Okay.

7           MR. LOPEZ:  That there's --

8           THE COURT:  All right.

9           MR. LOPEZ:  There's -- I mean, you look at big law

10 firms, you see people from big law schools; you see -- go to

11 smaller law firms, you see people from smaller law schools.  So

12 I think that's just kind of something that occurs.

13          THE COURT:  Okay.  Anything else, sir?

14          MR. LOPEZ:  Nothing else.

15          THE COURT:  Thank you.

16          I take it, Mr. Hartwig -- I mean Ms. Hartwig and

17 Mr. Roche, you don't have anything to add at this moment,

18 correct?

19          MR. ROCHE:  No, your Honor.  Just I'd like to point

20 out, I've only been in the case, like, two months; but in those

21 two months, Mr. Brodsky did help me transition the case and

22 able to settle the case.  Mr. Lubin assisted me in settling the

23 case.  And within two months, we were successful in reaching a

24 conclusion of the case.  We've exchanged settlement.  We've

25 exchanged case -- checks, case over.  And both attorneys, when

Lubin - Direct by Murphy

1    I dealt with them, acted extremely professional.

2              THE COURT:  Right, thank you.

3              So Mr. Roche, Mr. Brown, when you came on board,

4    Ms. Hartwig, everything did -- Mr. Northcutt, everything did

5    come together smoothly, and we actually dealt with the facts

6    and the law of the underlying matter.  I appreciate that, but I

7    still have my own work to do now.

8              MR. ROCHE:  Of course.

9              THE COURT:  So thank you.

10             MR. ROCHE:  Yes, your Honor.

11             THE COURT:  Okay.  So please call your first witness.

12             MR. MURPHY:  Mr. Lubin.

13             THE COURT:  Up here, sir.

14        (Approaching.)

15             THE COURT:  Raise your right hand.

16        (Witness duly sworn and takes the stand.)

17             THE COURT:  All right.  Have a seat.  And when you are

18   ready, you may begin.

19             PETER LUBIN, PLAINTIFF'S WITNESS, SWORN

20                      DIRECT EXAMINATION

21   BY MR. MURPHY:

22   Q    Mr. Lubin, in this case Mr. Brodsky accused you of

23   concocting an individual, a son of Mr. Szczesniak, Luke

24   Szczesniak.

25             Did you invent Luke Szczesniak?

Lubin - Direct by Murphy

1    A    No.  We obtained information from a son.  He has two sons,

2    and Luke is a son.  He's real.  He filed an affidavit that his

3    father was with him and was not at Diane Weinberger's house

4    smashing down a fence.  He was with him all day.

5    Q    So to be clear, you didn't invent Luke Szczesniak or invent

6    false affidavit testimony by Luke Szczesniak?

7    A    No.  We presented Luke's testimony because Mr. Brodsky said

8    that I should be sanctioned because I wasn't firing

9    Mr. Szczesniak as our expert in the case after expert discovery

10   had closed.

11         We needed Mr. Szczesniak for damages and liability and

12   other testimony, and we weren't going to fire him simply

13   because Mr. Brodsky was making up charges about him.

14   Q    And part of the defense to those accusations that

15   Mr. Brodsky was -- I'm sorry, Mr. Szczesniak was engaging in

16   improper behavior, part of the evidence that you submitted to

17   defend against those was a doctor's note, I guess, detailing

18   Mr. Szczesniak's whereabouts on one specific time that was in

19   question?

20   A    Yes, yes.

21   Q    And Mr. Brodsky has accused you of, again, inventing that

22   doctor and fabricating that doctor's note, submitting false

23   evidence to the Court.

24         Did you either fabricate the doctor or the doctor's

25   note to submit false evidence to the Court?

Lubin - Direct by Murphy

1   A   Absolutely not.  Mr. Brodsky said it again that I should be

2   sanctioned for not firing Mr. Szczesniak, because Mr. Brodsky,

3   based on pure speculation, said that Mr. Szczesniak had sent

4   him anonymous faxes from a U.P.S. store in Evanston.  And doing

5   a thorough investigation, talking to Mr. Szczesniak and other

6   witnesses, even looking at Mr. Szczesniak's cell phone records

7   and text message records, we determined that Mr. Szczesniak was

8   driving in LaGrange, over an hour away, probably an hour and 15

9   minutes away from Evanston, was driving his mother to a

10  doctor's appointment and couldn't possibly have sent these

11  anonymous faxes, which didn't have anything to do with anything

12  anyway.  I don't know how Mr. Brodsky came up with the idea

13  that Mr. Szczesniak had sent them to him, but he wasn't there.

14  And so we needed to get the doctor's note, and we needed to

15  go -- we were afraid his aged mother was going to have to come

16  to court, but we went and gathered all that evidence because I

17  wasn't -- you know, I had to respond to the motion that I

18  should be sanctioned for not firing Mr. Szczesniak because of

19  these charges.

20  Q   Another of the accusations that Mr. Brodsky has leveled

21  against you is that you conspired with Mr. Szczesniak to

22  fabricate this case against the defendant.

23          MR. BROWN:  Objection, your Honor.  That's a

24  mischaracterization.

25          THE COURT:  Okay.  Sustained.  Ask a different

Lubin - Direct by Murphy

1    question.

2            MR. MURPHY:  Okay.

3    BY MR. MURPHY:

4    Q    What evidence did you have to support the allegations of

5    the complaint that you filed against the defendant?

6    A    Well, the plaintiff contacted me on the telephone.  He was

7    very upset.  He contacted us on the phone, and he said he had

8    purchased a rebuilt wreck and that the car dealer would not

9    allow him to return it.  He called them up, they wouldn't send

10   it back, that he said as he was -- when he was driving out of

11   the car dealership onto the highway, the car started to rattle.

12   He took it into an Infiniti dealership in Indianapolis where he

13   lives, and they gave him a detailed report that there were

14   significant mechanical problems with the car that they had to

15   fix due to the accident, and the car had been in a severe

16   accident, and they outlined in a written report to him all the

17   problems with the car, which was a big concern to him because

18   he thought he was buying a nearly brand new car with 17,000

19   miles and he had paid $35,000 for it, and he didn't know that

20   he had bought a rebuilt wreck.

21           He then, at the advice of the Indianapolis

22   dealership --

23           MR. BROWN:  Your Honor, we're going to make a hearsay

24   objection, given that I believe this testimony should come from

25   plaintiff, not from plaintiff's lawyer.

Lubin - Direct by Murphy

1              THE COURT:  Okay.  So it's not offered for the truth

2      of the matter asserted.  It's offered, rather, for why he filed

3      the complaint, what he relied on.  And so if he's relying on

4      the plaintiff's statements, that is sufficient.

5              I'll object myself to the narrative, and see if you

6      can narrow it down to the different facts, if -- everyone has

7      used the word "truncated" a few times.  Let's see if we can

8      "cut to the chase," as my old judge used to say.

9              MR. MURPHY:  Sure, your Honor.  I'm actually going to

10     show Mr. Lubin an exhibit from the book of exhibits that we

11     provided.

12             THE COURT:  Okay.  What number is it, please?

13             MR. MURPHY:  It is Exhibit 37.

14             THE COURT:  And you gentlemen have a copy of that?

15             MR. LOPEZ:  Uh-hum.

16             MR. BROWN:  We do, your Honor.

17             THE COURT:  Okay.

18     BY MR. MURPHY:

19     Q   Mr. Lubin, you're looking at what we marked as Exhibit 37.

20             Do you recognize that exhibit?

21     A   Yes.  It's ultimately -- we had an earlier version of the

22     same exhibit that he got me that had the prior owner's name on

23     it.  It's from Dreyer and Reinbold, it's the Infiniti

24     dealership that my client, Donald Twyman, went to before he

25     ever contacted us to find out what was the matter with his car.

Lubin - Direct by Murphy

1    Q    Is there anything in the Dreyer and Reinbold report,

2    Exhibit 37, that formed the basis for the accusations in the

3    complaint?

4    A    Yes.  Page 6 -- there's many things in here, but page 6,

5    crash damage and paint all over, right front door had some

6    blend work, but appears the only part not heavily reworked,

7    rear hatch misaligned, rear bumper reworked, front bumper

8    replaced, frash -- front crash bar new, left and right front

9    wheel arches creased, hood alignment, doors, door gaps, entire

10   left side repainted, only right front door not worked on the

11   right side.  And then they went over a bunch of mechanical

12   problems that Mr. Szczesniak later explained to me could only

13   be due to a severe accident.

14   Q    Your testimony really has already made this point, so just

15   to crystallize it:  This inspection of the vehicle by Dreyer

16   and Reinbold occurred prior to filing of the complaint,

17   correct?

18   A    Yes.  And the client, Mr. Twyman, gave us that, and I gave

19   that to Mr. Szczesniak when I asked him to do a report before

20   we filed the case as well.

21   Q    All right.  I'm going to show you another exhibit,

22   Exhibit 38.

23        (Tendered.)

24   BY MR. MURPHY:

25   Q    Mr. Lubin, do you recognize what we marked as Exhibit 38?

Lubin - Direct by Murphy

1   A   Yes, I do.

2   Q   What is Exhibit 38?

3   A   Well, after Mr. Twyman took the car to the Infiniti

4   dealership, they recommended that he go to the body shop that

5   they regularly work with to get a more detailed report on the

6   damage to the car.  And this is the -- it's both photographs by

7   the body shop in Indianapolis that works with the Infiniti

8   dealer and an estimate of all the body repairs that would be

9   needed for this car to try to restore it from being a rebuilt

10  wreck to more like the car that Mr. Twyman thought he was

11  buying.

12  Q   And this body shop is Donny Moorehouse's body shop?

13  A   Yes.

14  Q   And this -- Donny Moorehouse, he looked at the car prior to

15  filing the complaint?

16  A   Yes.  And he said he believed it likely had a bent frame.

17  And then, more significantly to that, he outlined misaligned

18  panels, parts that needed to be replaced, and that the car was

19  not in good condition and needed, I think, according to him, at

20  least $9,000 worth of body work.

21  Q   And is this -- are these documents from Donny Moorehouse's

22  body shop, are those documents you reviewed and relied on in

23  drafting the allegations of the complaint?

24  A   I didn't rely on the photographs.  He produced those later

25  on.  I did rely on the estimate.  The photographs, where he

Lubin - Direct by Murphy

1    outlines all the problems with the car, he produced after we

2    filed the case.

3    Q    Other than the photographs --

4    A    Yes.

5    Q    -- his actual report from his inspection of the vehicle.

6    A    Yes.

7    Q    Now I'm going to show you what we've marked as Exhibit 40.

8         (Tendered.)

9    BY MR. MURPHY:

10   Q    Do you recognize what's been marked as Exhibit 40?

11   A    Yes, I do.

12   Q    What is that?

13   A    That's an affidavit from the Mannheim Auto Auction

14   authenticating the inspection report that Mannheim had done for

15   the car that was available to the defendant used car dealer

16   S & M before they purchased the car outlining in detail the

17   poor condition of the car.

18   Q    Will you turn to Exhibit A of that affidavit?

19   A    Yes.

20   Q    Can you describe what Exhibit A of that affidavit is?

21   A    Mannheim hires -- or has Mannheim, which is the largest

22   auto auction in the world and this data is used for the Blue

23   Book, they have a company that inspects the cars at the behest

24   of the auction seller and gives a condition report that's

25   available to the buyer before they purchase the car, and this

Lubin - Direct by Murphy

1    is the condition report for the FX37 that Mr. Twyman purchased.

2    Q    And this inspection occurred prior to Mr. Twyman's purchase

3    of the vehicle.

4    A    Yes.  It occurred prior to S & M, the defendant's purchase

5    of the vehicle as well.

6    Q    And is there information in that inspection that supported

7    the accusations in the complaint?

8    A    We obtained this in discovery after we filed the complaint.

9    It absolutely confirmed the allegations in the complaint and a

10   reason to continue the case.  There are 23 separate photographs

11   in here outlining the substandard body work on the car, and it

12   received a 1.9 rough rating, which means either the car has

13   been severely abused or been in a severe accident.

14   Q    So after reviewing that, nothing in your mind -- that

15   didn't undermine the allegations in the complaint; is that

16   correct?

17   A    No.  And it further supported the allegation that the

18   defendant was aware of the condition of the car before they

19   sold it to my client and didn't disclose that.

20   Q    I have one more question:

21          What impact has the statements Mr. Brodsky has made

22   about you and to you, what impact has that had on you?

23   A    Severe amount of stress and harm to my reputation,

24   including today when his attorney said I'm part of a racket

25   with other lawyers, that I'm an Ivy League lawyer who somehow,

Lubin - Direct by Murphy

1    you know, brought this on.  There's a tendency to have a pox on

2    both your houses when there's bad behavior.  It's easy to say

3    that the other person caused it.  And I feel like I'm a victim

4    of Mr. Brodsky.  I never mentioned my Ivy League pedigree to

5    him.  I talked to him on the phone for about 5 or 10 minutes in

6    the case where I asked him to please stop -- I'll use a better

7    phrase than I used -- busting my chops, to save it for when he

8    goes on, you know, Mancow's radio show, and let's try to be

9    civil and argue the case together.  So I had only brief

10    interaction with him.  Had no long-running history with him.  I

11    just met him in the case.

12           The only time I mentioned my education in this case, I

13    get seized on by his new lawyers, was to point out in our

14    sanctions motion that I have a reputation, that I did, you

15    know, attend good schools, but that's not -- my personality is

16    to be down to earth.  I don't think this was a clash between a

17    blue collar lawyer or anything else.  We filed pleadings.  We

18    tried to represent the client.  In fact, it caused so much

19    stress that I had every single email that I wrote in the case,

20    every single pleading, my partner went over and -- to make sure

21    that there was nothing untoward, especially after the Court

22    said to stop filing any vitriolic pleadings.  This is not what

23    I need in my practice.  I need to represent clients.  And I

24    think the most important thing I heard in this whole case that

25    gave me solace was when the Court said this is -- and it is for

Lubin - Cross by Lopez

1   me -- you know, like a near-sacred space and that, you know,

2   this is an honored profession.  It doesn't matter whether I'm

3   litigating for money or doing a criminal case, I'm an officer

4   of the court.  You know, my truth is my bond.  And my

5   reputation is probably the most important thing to me, after 30

6   years of practicing law.  My dad was telling me that he had

7   been practicing law for 60 years when I came here.  I -- this

8   is very hard -- has been very hard on me.

9           MR. MURPHY:  I have no further questions of this

10  witness, your Honor.

11          THE COURT:  Okay.  Do you want to cross?

12          How about you, Mr. --

13          MR. LOPEZ:  Can I speak to --

14          THE COURT:  Sure, go ahead, have a moment.

15      (Pause in proceedings.)

16          MR. LOPEZ:  We have a couple of questions.

17                      CROSS-EXAMINATION

18  BY MR. LOPEZ:

19  Q   Mr. Lubin, you indicated that you suffered some emotional

20  distress; is that correct?

21  A   Yes.

22  Q   And you're saying that's a result of Mr. Brodsky's

23  pleadings in this case against you?

24  A   Yes, and what happened in court.  The judge -- when you

25  weren't here, when he originally said that I engaged in

Lubin - Cross by Lopez

1  misconduct in the deposition, before the Court had a chance to

2  familiarize itself with the record, on one occasion told the

3  clerks that I was one of the most unprofessional lawyers that

4  had been in the courtroom with him and said that her clerk

5  shouldn't -- that they shouldn't model themselves after me, so

6  that was very upsetting.

7  Q    Which court was that?

8  A    It was here.  Another -- yes.  Another occasion here, when

9  the dispute arose about the deposition, the Court said that --

10 the Court said she didn't know who to believe and that, you

11 know, she was considering reporting both lawyers to the ARDC,

12 and I had to retain separate counsel through the ISPA to come

13 here.  I -- you know, when the Court was indicating that there

14 were vitriolic pleadings and, you know, that they needed to

15 stop from both lawyers, you know, I had, you know, extended,

16 you know, conversations with my partner about how to reduce the

17 pleadings.  I was upset at, you know, at home.

18         Obviously, when those things happen -- but, you know,

19 when you get emails every night, when my partner's son, you

20 know, who is working for us sends emails to Mr. Brodsky and

21 we're terrified what the next email is going to be from him,

22 you know, when I go to his law office, you know, it's -- you

23 know, you're sort of laughing, but we were sort of afraid

24 for -- you know, afraid when we went to his office with -- you

25 know, his behavior at the deposition was very -- was very

Lubin - Cross by Lopez

1    disturbing.  And, yes, it's been -- it's also -- no one has

2    ever called me, you know, said that I'm part of a criminal

3    enterprise, that I'm a lawyer akin to -- a lawyer in the 1980s

4    who staged fake personal injury accidents, when we had an

5    abundant factual basis to bring this case.

6         So when that goes in federal pleadings and things are

7    untrue are said about you that are really, really harmful, that

8    would be libel, per se, outside of a courtroom, and you've been

9    doing this for 30 years, it's extremely upsetting.  And when

10   you make a decision that you're not going to respond and you're

11   going to restrain yourself -- and, you know, I challenge you to

12   look at any email in this case or any pleading in this case

13   where we exchanged words with Mr. Brodsky.  I consciously never

14   exchanged any words with him, remained civil, was never

15   condescending to him.  Barely interacted with him outside of

16   emails.

17        So it was extremely stressful to have a small case,

18   that I normally would like to resolve quickly and efficiently,

19   become this, you know, personal war against me that was a

20   one-way war.

21        So, you know, it was extremely upsetting to me and

22   caused a lot of stress to me and my family.

23   Q    Did you -- how many phone calls do you think you had with

24   Mr. Brodsky?

25   A    I think the one inaccurate thing in my associate's

Lubin - Cross by Lopez

1    presentation was numerous phone calls to resolve depositions.

2    I had two phone calls with him during the entire case.  The one

3    that I remember is the one I recounted in my testimony where I

4    sort of pleaded with him to stop the uncivil behavior.  And so

5    both phone calls were very civil with him, and I was hoping

6    that would carry over to the emails.  But as soon as those

7    ended, I would get these criminal enterprise emails.  And once

8    or twice I said can you please stop, because it is stressful,

9    and what he did was he doubled down.  He said he's calling a

10   spade a spade.  It wasn't hyperbole.  He was saying that I was

11   engaged in a criminal enterprise with Mr. Szczesniak, that

12   Mr. Szczesniak takes lawyers who are pawns, fabricates car

13   cases to harm victim -- used car dealers.  I mean --

14   Q    Can I ask you a question about that statement you just

15   made?  Is that statement he made here in an email?

16   A    No, he made it in a federal pleading.

17   Q    No, I understand that.

18        Did he make that -- did he send an email in that

19   regard first --

20   A    Yes.

21   Q    -- before the pleading?

22   A    Yes, repeatedly -- well, no, the pleadings he probably said

23   before.  It was intermingled.  He said it repeatedly in emails,

24   and I asked him to stop, and repeatedly in pleadings, it was --

25   on and on, every time, if I asked him to stop, he would

Lubin - Cross by Lopez

1   escalate, the next email would be worse.

2   Q    These emails were between you and he and not -- and not

3   part of the public record; is that correct?

4   A    No, the -- well, now they're part of the public record.

5   Q    You made them part of the public.

6   A    Yes, I did.

7   Q    They were emails -- communications between Mr. Brodsky and

8   yourself; is that right?

9   A    No.  For example, the one that Mr. -- many of them would

10  be, let's say, Mr. Murphy would send him an innocuous email

11  that we need to schedule a deposition.  I wouldn't even be on

12  the email.  And then he would copy Mr. Murphy back and me and

13  say I'm, you know, like how can I call myself a lawyer, or

14  my -- you know, one of my support clerks would send him some

15  documents, third-party discovery, and I might be on it, and he

16  would respond back to my entire staff that I was a crook, or he

17  would, you know, send emails, you know, to other people --

18  Q    When you say your entire staff, are you talking about --

19  A    My law firm.

20  Q    -- your secretaries and everybody else, or just you and

21  your associates?

22  A    My secretaries and everybody else.

23  Q    So he had communications with your secretary?

24  A    Well, like -- so my secretary would send an email, we're

25  producing this document, and might copy me on it.  And he would

Lubin - Cross by Lopez

1   respond back with this email to all of us saying something

2   nasty about me.  They're in the -- they're all in the record.

3   Q    Okay.  They're in your plaintiff's exhibits?

4   A    Yes.  And they're also in the -- they're attached to our

5   sanctions motion as well.

6   Q    The emails that you had with Mr. Brodsky and your staff,

7   these were during the course of the litigation from the time

8   that you filed the lawsuit until about April of this year?

9   A    Well, until he, you know, until he withdrew from the case.

10  Q    That was in about April.  That was April of this year.

11  A    Whenever he withdrew.

12  Q    Whenever it was.

13  A    Yes.

14  Q    But it started -- when you filed the lawsuit, did

15  Mr. Brodsky call you up after his client was served to tell you

16  he was going to be representing him?

17  A    I don't believe so.  I believe it was -- he filed an

18  appearance, and I think the first time I spoke to him was the

19  second court appearance.  I think Mr. Murphy attended the first

20  one.  And I said to him, you know, why don't we try to settle

21  this case?  And he said the car was never in an accident, I

22  couldn't prove it because I guess it's sort of like we don't

23  have the body.  So we ultimately, when we got proof -- we had

24  proof that it was in an accident because it had all accident

25  damage on it, which is sort of -- but when we finally got proof

Lubin - Cross by Lopez

1    that it was in an accident from the insurance company and the

2    photos of it, then it became it was in a mere fender-bender

3    that caused $13,000 worth of damage, but I talked to him very

4    briefly.  He was very adamant he was going to never settle the

5    case, it had never been in an accident, you know.  When I said

6    we had an expert, which was Mr. Szczesniak, that it had been in

7    an accident, he said, well, he can -- this I do remember -- he

8    said he can find an expert who will say anything so it doesn't

9    matter that I have an expert who says it was in an accident.

10   Q    And over the course of your practice in civil court, you

11   have seen situations where experts disagree; isn't that true?

12   A    You can't disagree if a -- if a hood has been bent in two

13   and pushed back together.  That's a fact.  So, no, I haven't

14   seen situations where there's physical damage to an object and

15   one person says the physical damage isn't there and the other

16   person, that anybody can look at and see the physical damage,

17   can see it there, so that I have not seen in a civil case.

18   Q    You have -- you have seen experts.

19   A    Experts disagree, yes.

20   Q    Disagree all the time about certain things, correct?

21   A    Yes, they do.

22   Q    Now, have you received any treatment or counseling as a

23   result of any of this emotional distress?

24   A    No.  This is not the level of things I'd seek treatment for

25   or -- this type of emotional distress, but it is -- I do talk

Lubin - Cross by Brown

1 to friends and colleagues and lawyers about -- about the stress

2 and, you know, they help you out.  They tell you to just ignore

3 it and try to move on.  But, yeah, you have to talk to people

4 about it to feel better, but not -- I don't need to go to a

5 therapist about this particular issue.

6 Q    Have you received any communications from any clients

7 discharging you from any cases as a result of Mr. Brodsky's

8 pleadings?

9 A    No.  That has no impact on that.

10    (Counsel conferring.)

11         MR. BROWN:  Just one.

12                         CROSS-EXAMINATION

13 BY MR. BROWN:

14 Q    Mr. Lubin, I just want to clarify the loss of reputation.

15 A    Sure.

16 Q    Has anyone said anything to you that would lead you to

17 believe they believe any comment?  Has anyone else accused you

18 of being a criminal, reiterating Mr. Brodsky's allegations?

19 A    Mr. -- his attorney said I'm part of a racket, so it was

20 sort of an allusion that there was some truth to the hyperbole.

21 Other than that, no.

22 Q    Thanks.

23         MR. BROWN:  That's all, your Honor.

24         THE COURT:  Anything else, sir?

25         Any redirect?

Lubin - Direct by Northcutt

1          MR. MURPHY:  No, your Honor.

2          THE COURT:  I'm -- did you -- I'm sorry, I should have

3     done direct, direct, but --

4          MR. NORTHCUTT:  Your Honor --

5          THE COURT:  -- I forgot about you.

6      (Laughter.)

7          MR. NORTHCUTT:  You wouldn't be the first officer of

8     the court to do so, your Honor.

9          THE COURT:  I'm sorry.  We'll just do it this way,

10    though.  This works just fine.  You go ahead and ask any other

11    questions that pertain to you, please.

12         MR. NORTHCUTT:  Thank you, your Honor.

13                        DIRECT EXAMINATION

14    BY MR. BROWN:

15    Q   Mr. Lubin, I want to start with a couple things, just to

16    clear the record.

17         Why did you hire Mr. Szczesniak?

18    A   First of all, he came highly recommended originally from

19    one of the top car lawyers in probably in the country.

20    Secondly, he has a degree in mechanical engineering from the

21    engineering school that was -- used to be called General Motors

22    Institute, so he studied engineering, specifically how to build

23    cars.  Then -- so it was his resume.  He also was a car dealer.

24    He's hired by car dealers to buy used cars at the auction.

25    He's an expert in both the engineering of the car, how it's

Lubin - Direct by Northcutt

1    built, damage to it, and valuations of cars.  In these cases,

2    you're required to have an independent expert to give the

3    damages testimony.  The Illinois courts that mostly deal with

4    these car cases generally do require an expert to testify as to

5    damages.

6    Q    And prior to hiring Mr. Szczesniak, were you ever made

7    aware of any instance in which his expert testimony or --

8    excuse me, where he was not accepted as an expert in his field?

9    A    No.  In fact, we had two contested arbitration hearings

10   where not only was his expert testimony accepted, but we were

11   awarded to the dollar, in one case over $30,000 for a flood

12   car, to the dollar, the diminished value that he set on the

13   car.  And there are other cases that I've given to him to look

14   at before we file, just like I gave him this case before we

15   filed.  So it wasn't just the evidence I had from the car.  He

16   did a complete report for me before we filed the case,

17   interviewing the client, inspecting the car, and he will tell

18   me his truthful opinion if the car doesn't have damage and

19   doesn't warrant a lawsuit.  So there are cases that I've turned

20   down or we haven't pursued because Mr. Szczesniak said the --

21   that there was no case there.

22   Q    So I want to be clear on that point for a moment.

23        Are you telling Judge Kendall that there have been

24   instances where you asked him to review a case in anticipation

25   of a lawsuit, and he as an expert said you don't have a case

Lubin - Direct by Northcutt

1    here?

2    A    That's correct.  He also had a case where he gave a

3    preliminary opinion, because the client wouldn't let him do a

4    full inspection.  He came and met with me and the client and

5    said the car was not in nearly as bad condition warranted --

6    you know, as warranted, and we settled the case because he, you

7    know, said after doing a more detailed inspection that there

8    was not as much damage as the client thought, and we needed to

9    settle the case, and we settled the case.

10   Q    Okay.  I want to turn quickly to the skullduggery that you

11   were accused of by Mr. Brodsky.

12            First of all, are you a lemon lawyer?

13            THE COURT:  Now, there's a word I have not heard in my

14   courtroom yet.  Skullduggery.

15            MR. NORTHCUTT:  Judge, I'm going to give attribution,

16   John Kennedy from Taft, straight out of his playbook.

17            THE COURT:  Okay, there you go.

18            MR. NORTHCUTT:  That is not my -- that is not mine.

19   That's stolen.  I'm not a pirate.

20            THE COURT:  Okay.  You can answer the question if you

21   remember.

22   BY THE WITNESS:

23   A    So what was the question about the skullduggery?

24   BY MR. NORTHCUTT:

25   Q    Going back to the accusation that you were in a criminal

Lubin - Direct by Northcutt

1    conspiracy with my client, to state the obvious, were you in a

2    criminal conspiracy with my client?

3    A    No.

4    Q    Of any kind at any point in your life.

5    A    Never.

6    Q    And with respect to your allusions previously in your

7    testimony about Mr. Brodsky urging you to fire Mr. Szczesniak,

8    explain to the Court what you mean by that?

9    A    His brief said I should be sanctioned because we hadn't

10   fired Mr. Szczesniak, and he was sending emails saying we were

11   two peas in a pod and why didn't we get rid of him, and he

12   was -- he was attacking Mr. Szczesniak because Mr. Szczesniak

13   is a fantastic expert and he thought it would hurt our case to

14   get rid of him.

15   Q    Was this stated on a single occasion or more than one

16   occasion?

17   A    Well, in the pleadings, I know on the motion for sanctions

18   against me and Mr. Szczesniak, it was said in there that we

19   needed to fire him, and he doubled down on it a couple times in

20   those pleadings.

21   Q    How long have you been a lawyer?

22   A    Since 1983.

23   Q    State and federal practice?

24   A    Yes.

25   Q    In the course of your experience as a lawyer in both state

Lubin - Direct by Northcutt

1   and federal court, have you ever been made aware of a situation

2   where failure to fire an expert constitutes sanctionable

3   conduct?

4   A    No.   It was sanctionable to make the argument.

5   Q    And --

6            MR. BROWN:   Objection, your Honor.

7            THE COURT:   Sustained.   It's a legal conclusion.   That

8   will be my conclusion to make.

9            MR. NORTHCUTT:   Understood, your Honor.

10  BY MR. NORTHCUTT:

11  Q    Now, I want to also talk to you about -- you had alluded to

12  some of the effects that this had on you.

13           At any point did you fire Mr. Szczesniak?

14  A    That wasn't going to happen.

15  Q    Why?

16  A    Because I've seen his testimony in this case.   I went over

17  with him his basis for his diminished value of this car, his

18  basis for why this car was a rebuilt wreck, how his testimony

19  matched exactly with three independent experts -- Mannheim,

20  Donny Moorehouse, and the Infiniti dealership -- his testimony

21  was -- all this extraneous stuff about him had nothing to do

22  with his testimony, that this was a rebuilt wreck and it was

23  worth substantially less than the $35,000 that Mr. Twyman paid

24  for it.   That was it.   There was no question we weren't going

25  to let him go.

Lubin - Direct by Northcutt

1   Q    You've also told us that you have extensive experience in
2   state practice as well, correct?
3   A    Yes.
4   Q    You're familiar with the Circuit Court of Cook County?
5   A    Yes.
6   Q    Has it been your experience that the Circuit Court of Cook
7   County has no rules?
8            MR. BROWN:  Object, Judge.
9   BY THE WITNESS:
10  A    Some of the finest judges I know are there.  I -- you know,
11  that's just not true --
12           THE COURT:  Okay.  So I'm going to sustain.  It's
13  overly broad.  It's vague.
14           And you can ask a different question.
15           MR. NORTHCUTT:  Your Honor, I'll withdraw and
16  rephrase.
17           THE COURT:  Okay.
18  BY MR. NORTHCUTT:
19  Q    I want to read you a quote, and I want you to tell me if
20  this represents your experience in this case with Mr. Brodsky.
21           Quote:  The problem is that Brodsky has come out of
22  the Daley Center where civil cases in Cook County court are
23  fought.  And the first rule at the Daley Center is that there
24  are no rules.
25           Based on everything you've experienced, Mr. Lubin, in

Lubin - Direct by Northcutt

1    this case, would you say that that is an accurate --

2              MR. LOPEZ:  Objection, Judge.

3              MR. BRODSKY:  Quoting Mr. Lopez.

4              MR. LOPEZ:  It's not Mr. Brodsky's statement.

5              MR. NORTHCUTT:  I didn't say it was Mr. Brodsky's

6    statement, your Honor.

7              THE COURT:  Hold on just a moment and let me just read

8    what you're reading.

9         (Pause in proceedings.)

10             THE COURT:  So what are you reading from?

11             MR. NORTHCUTT:  Your Honor, I am reading a quote that

12   was attributed to Mr. Lopez on behalf of Mr. Brodsky that is

13   completely in keeping with some of Mr. Lopez's comments to the

14   Court earlier.

15             THE COURT:  Okay.  You can -- I'm going to sustain

16   that question -- objection to that question.

17             Try to rephrase and in keeping with our rules of

18   evidence, and we'll see if we can get you to where you need to

19   be.

20             MR. NORTHCUTT:  Certainly, your Honor.

21   BY MR. NORTHCUTT:

22   Q    Mr. Lubin, were you made aware of a quote that was

23   attributed to Mr. Lopez on behalf of Mr. Brodsky that appeared

24   in the *Chicago Tribune* regarding this case?

25   A    Yes, and by some judges in the Circuit Court who told me

Lubin - Direct by Northcutt

1    they were deeply offended by it.

2    Q    Specifically --

3              MR. BROWN:  Objection.  Hearsay, your Honor.

4              THE COURT:  Okay.  That's -- you know, in my

5    courtroom, Mr. Brown, you stand when you object.  And part of

6    the reason is so that you get your objection on the record,

7    because she has to turn her ear toward you.

8              MR. BROWN:  My apologies.

9              THE COURT:  That's sustained, and the hearsay is

10   stricken.

11             Go ahead.

12   BY MR. NORTHCUTT:

13   Q    Without characterizing it, I just want to ask you, are you

14   aware of that quote?

15   A    I read it.

16   Q    Okay.  And based on everything that you've experienced in

17   that case, do you see that as the catalyst for the problem that

18   brought us here today?

19   A    Honestly, no.  I think there's some imbalance there that --

20   that's my honest thing.  I don't think it's -- why someone

21   believes there are no rules and that they can conduct

22   themselves in the manner he has, there's some type of imbalance

23   that would cause that, because I did nothing to cause this.

24   And it's not vigorous advocacy.  It's some type of imbalance

25   that needs to be dealt with.  You know, since this, if the

Lubin - Direct by Northcutt

1   Court says it's hearsay, a number of lawyers have contacted me

2   who said that they were deeply upset --

3   Q   Without characterizing what other lawyers have told you, is

4   there anything, Mr. Lubin --

5           MR. BROWN:  Objection, your Honor, to the statement of

6   what other lawyers may or may not have said.

7           THE COURT:  Well, actually, I think he's trying to

8   rope his witness into the parameters of avoiding the hearsay,

9   so, yes, sustained, but you can't comment about what the other

10  lawyers have said.

11          Let's get to the heart of what you were trying to

12  elicit, sir.

13  BY MR. NORTHCUTT:

14  Q   Mr. Lubin, is there anything that you have done personally

15  to contribute to any belief that there has been a criminal

16  conspiracy that involves my client in this case?

17  A   No.  We've tried -- done everything in our power to refute

18  that.

19  Q   Thank you.

20          MR. NORTHCUTT:  Nothing further, your Honor.

21          THE COURT:  Okay.  Anything on that?

22          You can have a few questions.  You looked guilty.

23      (Laughter.)

24          THE COURT:  I'm asking.  It's your day.  Go right

25  ahead.

Lubin - Cross by Brown

1          MR. BROWN:  I take no pleasure in cross-examining

2     another lawyer.

3          THE COURT:  Understood.  You may proceed.

4                         CROSS-EXAMINATION

5     BY MR. BROWN:

6     Q    What other lawyers commented to you regarding Joel Brodsky?

7     A    Jim Dahl.  He's the one who gave us the emails that we've

8     now put into the record where Mr. Brodsky called him a fat

9     slob.

10          And the other lawyer who was reported to the ARDC by

11    Judge Nega, he has a Greek name, I don't recall his name, but

12    he had seen the newspaper article in the *Tribune*, said he

13    was -- had been very upset by Mr. Brodsky's conduct towards his

14    lawyer and him in his case, and he supplied me with those

15    letters, and he said it was a pattern.

16          And then there's some other -- there was -- there's

17    some judges that have commented to me about it.  I can't

18    remember the judge's name, but he commented.  It's someone who

19    practices at 26th and California.  I don't remember the judge's

20    name.

21    Q    Can't remember the judge?

22    A    I remember that I had the discussion with the judge.  It

23    was at -- it was at when I was doing the Trial Practice for the

24    Mandel Legal Aid Clinic, and Brodsky came up -- so this was a

25    while ago, this was in September of last year -- and he

Lubin - Cross by Brown

1    commented about, you know, some of the uncivil emails that he

2    had sent.  And I guess the lawyer who can't get along with him

3    from the Peterson case called me up on the phone.

4    Q    What's his name?

5    A    I never met him before.  His name is Greenberg.  And then

6    he went over some of the behavior of Brodsky, too, with me on

7    the telephone.

8    Q    Anything that would refresh your recollection regarding the

9    judge?

10   A    No, because it was someone I was talking to in the hallway

11   during the -- during the Trial Practice at the Daley Center.

12   Q    Okay.  I'll let that go.

13        With respect to the two individuals you named who

14   provided you with letters, communications, it was your

15   understanding those were private communications?

16   A    No.  They told me that they didn't want them to be private,

17   that they thought it was important for the Court to know that

18   this was a pattern with Mr. Brodsky, and they felt that

19   something needed to be done about his behavior because he acted

20   in such an extreme uncivil manner towards specifically Jim

21   Dahl, who has called me up on another -- on a number of times

22   and said he had been very upset by the way Mr. Brodsky had

23   treated him, and he -- and he said that he wanted me to have

24   these emails that -- to put into the record because he thought

25   the behavior needed to end, and it wasn't, you know, something

Lubin - Cross by Brown

1   that was unique to me, and that he had also heard that this was

2   a practice --

3            MR. BROWN:  Objection.  Narrative, your Honor.

4            THE COURT:  Okay.  So here's the situation, folks.  I

5   have a very limited review.  It is about the behavior that took

6   place within my courtroom.

7            MR. BROWN:  Thank you.

8            THE COURT:  So all of the information regarding

9   previous behavior is only relevant to one thing, and that is

10  his knowledge and state of mind as to whether he had been

11  warned in the past about a behavior that is the same behavior

12  that would violate Rule 11 or the codes of conduct in a

13  professional setting.  So raking up old cases from other

14  courtrooms with other judges is not going to aid me in my

15  determination of the facts of this case.  Like I said, the only

16  thing that matters to me is whether there has been a previous

17  warning shot or sanction that would put him on notice that the

18  behavior that is alleged here is violative of the professional

19  conduct rules.  Okay?

20           So to the extent that you're all putting in previous

21  cases, it's not relevant to my consideration.  Okay?

22           MR. BROWN:  Your Honor, in truth, we had had some

23  discussion about that.  My only -- the only reason why I was

24  asking about that is we didn't feel as though the exhibits that

25  were attached to the motion to supplement the sanctions motion

Lubin - Cross by Lopez

1   should have been -- should have been submitted in this case.

2          THE COURT:  Fair enough.  Okay.

3          MR. BROWN:  And there will be disagreement there.

4          THE COURT:  Fair enough.  Okay.  Thank you very much.

5   All right.  Are you done?  All right, gentlemen.

6          MR. BROWN:  I am, your Honor.

7          THE COURT:  Mr. Lopez, anything for you?

8          MR. LOPEZ:  I just wanted to ask just a couple

9   questions.

10         THE COURT:  Sure you can.

11                       CROSS-EXAMINATION

12  BY MR. LOPEZ:

13  Q   Mr. Lubin, I know that you and your associate put together

14  plaintiff's exhibits.  And from what you've reported to the

15  Court, you spent a lot of time investigating or talking to

16  people about Mr. Brodsky's prior history.

17         Are you aware of any court order imposing any

18  sanctions on Mr. Brodsky for any of his conduct?

19  A   Yes.  Judge Mitchell threw him out of a case and reported

20  him to the ARDC.  And I think Judge Nega, in one of the other

21  letters we had, reported him to the ARDC for his conduct.

22         (Counsel conferring.)

23  BY MR. LOPEZ:

24  Q   In that particular case, both lawyers were removed from the

25  case.  There was no monetary award of sanctions.  Isn't that

Lubin - Cross by Lopez

1   true?

2   A    No.  Worse award, he was disbarred from representing his

3   client and he was thrown out of the case.  And it doesn't

4   matter that both lawyers were unprofessional.  I'm only

5   interested -- we were only interested in -- there were two

6   points to the relevance:  One, that he had been warned before

7   and to stop; and, two, there was the accusation that I caused

8   his conduct somehow.  You've continued that in your pleadings

9   yesterday saying I was condescending to him, that somehow my

10  behavior caused him to act like this.  So our point was

11  two-fold:  One, he had been told to stop by other judges; and,

12  two, it has nothing to do with my behavior.  This is just his,

13  you know, *modus operandi* with people that he has litigation

14  with.

15          THE COURT:  Mr. Lopez, I need a foundation for this

16  statement.

17          So there were two cases mentioned, and now you were

18  talking about one case, and I don't know the case nor the court

19  nor the time frame or anything.

20      (Counsel conferring.)

21          MR. LOPEZ:  It's in one of the exhibits.

22          THE COURT:  Thank you.

23          Does anyone have a number for me so I can --

24  BY THE WITNESS:

25  A    It's not our trial exhibit, your Honor.  It's in the

Lubin - Cross by Lopez

1    sanctions motion -- is it the trial exhibits, too?

2         (Counsel conferring.)

3              THE COURT:  Okay.  I'll let you identify the exhibit

4    for me later.

5              Continue, Mr. Lopez.

6    BY MR. LOPEZ:

7    Q    Sir, in that particular case, there was no award of

8    sanctions -- monetary sanctions against Mr. Brodsky, was there?

9    A    That's correct.  No monetary sanctions.  There was a

10   sanction of being removed from the case.

11   Q    And as a result of anything that might have occurred in

12   there, you were not made aware of ARDC doing anything to

13   Mr. Brodsky as a result of that; isn't that also true?

14   A    Well, I don't have communications with the ARDC.  The

15   lawyer who contacted me -- this is hearsay, so I won't say

16   it --

17   Q    Let me reask --

18   A    I do have information that they're continuing, but I don't

19   know if it's reliable or anything else because it came from

20   this lawyer who contacted me, so I don't want to put that in

21   the record.

22   Q    I understand that, but did you look on the ARDC website to

23   see whether or not he had been previously sanctioned for this

24   type of conduct?

25   A    He had been sanctioned for other conduct, for taking money

Lubin - Cross by Lopez

1    and putting it in a safe.

2    Q    I'm talking about this conduct, about this particular

3    conduct --

4    A    Conduct with other -- dishonest conduct --

5              THE COURT:  You have to --

6    BY THE WITNESS:

7    A    -- yes, he had been sanctioned --

8              THE COURT:  Hold on.  He's not done answering the

9    question.

10             THE WITNESS:  I'm sorry.  I'm sorry, your Honor.

11             THE COURT:  We can only get one voice at a time, so

12   wait until he finishes his question and then go ahead and

13   answer.

14   BY MR. LOPEZ:

15   Q    Are you aware of any Rule 11 sanction motions that have

16   been granted against Mr. Brodsky or any other type of motion in

17   federal court?

18   A    I know a federal judge in a reported decision, yes,

19   chastised him for talking uncivilly to the judge's support

20   staff.  That's the identical conduct he engaged in here.  And

21   we cited that to the Court in our sanctions motion.  It was

22   written by a federal judge.  It was not a Rule 11, but it was

23   for the same type of behavior here.

24   Q    So there's no Rule 11.

25   A    I don't know.  Mr. Brodsky would know if he's been

Lubin - Cross by Lopez

1    sanctioned under the rules before.  I didn't research that

2    issue.

3    Q   Well, I would assume that you would have researched the

4    issue while you were preparing this and would have brought

5    forth this information to the Court had it existed.

6    A   I didn't research that because -- so we didn't research if

7    he had been subject to another Rule 11 motion.

8    Q   You're not aware of any.

9    A   I just said I'm not aware of any.

10       (Counsel conferring.)

11          MR. LOPEZ:  I have nothing further, Judge.

12          MR. MURPHY:  Your Honor, you were wondering about that

13   exhibit number.  It's Exhibit 20.

14          THE COURT:  Yes, thank you.  I'll write that down.

15          Sir, you can step down then.

16       (Witness excused.)

17          THE COURT:  Let's take a 15-minute break, and then

18   we'll come back and resume your evidence.

19          LAW CLERK:  All rise.  Court is in recess.

20       (Recess taken from 10:53 a.m. to 11:12 a.m.)

21          THE COURT:  Okay.  Please be seated and call your next

22   witness.

23          MR. MURPHY:  Your Honor, Mr. Northcutt will be

24   examining Mr. Szczesniak.

25          THE COURT:  Okay.  Up here, sir.

1      (Approaching.)

2           THE COURT:  Please raise your right hand.

3      (Witness duly sworn and takes the stand.)

4           THE COURT:  Okay.  Have a seat.

5           MR. NORTHCUTT:  May I proceed, your Honor?

6           THE COURT:  Let's make sure everybody is here.

7           Yes, you can proceed.

8           MR. NORTHCUTT:  Thank you, your Honor.

9           DONALD SZCZESNIAK, PLAINTIFF'S WITNESS, SWORN

10                    DIRECT EXAMINATION

11     BY MR. NORTHCUTT:

12     Q    Sir, if you would please introduce yourself to

13     Judge Kendall, and spell your name for the court reporter.

14     A    My name is Donald Szczesniak.  My last name is spelled S,

15     as in Sam, Z in zebra, C in cat, Z as in zebra, E, S as in Sam,

16     N-I-A-K.

17     Q    What do you do for a living, sir?

18     A    I run a business purchasing vehicles at the auction for

19     other dealers, as well as I hold myself out to be an expert in

20     automotive matters to attorneys for consulting purposes and

21     testimony.

22     Q    And do you testify for one side in particular or the other,

23     plaintiffs or defense?

24     A    No.  I testify for either side.  Or sometimes when it's an

25     amount of damage to be determined, they agree to accept my

Szczesniak - Direct by Northcutt

1    damages to reach a settlement.

2    Q    Understood.

3          And how long have you been doing this type of

4    consultancy work?

5    A    I think I did my first case December -- it was December 28,

6    2009.

7    Q    And since 2009, has -- have your qualifications as an

8    expert in your field ever been rejected?

9    A    No.

10   Q    About how many cases have you been involved in either as a

11   testifying expert or as a consultant?

12   A    As a consulting expert or testifying, because everything

13   starts with a consultation, I think I'm well over 600 now.

14   Q    Mr. Szczesniak, have you ever been presented with a

15   situation where you're afforded an opportunity to serve as a

16   consultant but you reject a case based on the facts?

17   A    I would render an opinion; but at that time, then maybe my

18   services aren't used anymore.

19   Q    Stated another way, have you ever been in a situation where

20   you rendered an opinion that was detrimental to the interests

21   of the person who retained you?

22   A    Yes.

23   Q    How many times has this happened?

24   A    Maybe 20 times.

25   Q    In those approximately 20 times, you understood that by

Szczesniak - Direct by Northcutt

1    doing so, it would stand to reason that you wouldn't be hired

2    and wouldn't get paid.

3    A    Well, you know, first, it's an independent report.  It's

4    independent.  The initial report is independent.  So then at

5    that time, maybe they'll go find someone else, a different

6    expert, but my services are done, and I figure they are going

7    to be done going into it at that time.

8    Q    Well, to be clear, though, is there anything about the fact

9    that you wouldn't get paid perhaps if you said -- phrased your

10   opinion in a certain way that would dissuade you from being

11   honest in an opinion?

12   A    No, no.  I think my reputation is more important than that.

13   It's -- I mean, it's a larger portion of my income now, but my

14   reputation is what matters.  It's not -- not one case.

15   Q    How many people in your immediate family?

16   A    There are four of us.  There's my wife, Jennifer, and my

17   two sons.

18   Q    What are your sons' names?

19   A    My younger son is Luke, and he'll be 17 in August.  And my

20   older son is Zachary, and he just turned 20 in June.

21   Q    And does your mother live with you?

22   A    No, she does not.

23   Q    How old is your mother?

24   A    My mother is 76.

25   Q    I want to turn our attention to what happened specifically

Szczesniak - Direct by Northcutt

1    in this case.

2          First of all, what, in general terms, was your role in

3    this case?

4    A    I initially was contacted by Mr. Lubin that Mr. Twyman

5    would have me inspect the vehicle.  I've done a few cases for

6    Mr. Lubin.  He doesn't do many lemon law cases or

7    automobile-related cases.  And I said okay.  And Mr. Twyman

8    contacted me, and we agreed to meet, and I inspected the

9    vehicle and test-drove the vehicle.  And the test drive was

10   scary, to say the least.  But I initially went there and I did

11   an initial consulting report to determine that the car had some

12   type of damage on it, frame damage.

13   Q    Would it be fair to say that you've been involved

14   extensively in this case in terms of consulting and rendering

15   your opinions based on the information that you received and

16   your own work that you did in this case?

17   A    Yes.

18   Q    And have you throughout this process exercised your own

19   professional judgment in rendering your opinions and

20   participating in this case?

21   A    Yes.

22   Q    Have you in any way said anything in the course of this

23   case that is false, misleading, or otherwise intentionally

24   inaccurate with respect to your representations as an expert?

25   A    No, I have not.

Szczesniak - Direct by Northcutt

1   Q    Have you ever in your life been cited by a court as having

2   submitted any false evidence or false testimony?

3   A    No.

4   Q    Are you familiar with a woman named Diane Weinberger?

5   A    Yes, I am.

6   Q    And Ms. Weinberger is someone that you had helped in a

7   professional capacity before?

8   A    Yes.  She had hired me a long time ago to do a small case

9   against a dealership in DuPage County, a Lexus dealer that she

10  bought a used car at.

11  Q    And at some point you became involved in litigation with

12  her, correct?

13  A    No.  Her actual underlying case was settled.  And at the

14  time, Mr. Lehr (phonetic), who I was referred to her by, was --

15  found out he was diagnosed with cancer, and so there was a lot

16  of legwork to be done with the case to return the vehicle, and

17  I became involved in the return of the vehicle.  And she lived

18  all the way I think in Dwight, Illinois, and I helped to

19  transport her back to Mr. Lehr's office to get her traded

20  vehicle back.

21  Q    Okay.  But more to the point, at any point did you have a

22  small claims case against her?

23  A    Yes.  After everything was said and done, there was some

24  fees due me, less than 500 bucks or maybe it was $500.  And at

25  the point Mr. Lehr had given up his practice, so there were

Szczesniak - Direct by Northcutt

 1   several clients that I had to, unfortunately, chase for small

 2   amounts of money.

 3   Q   And Ms. Weinberger was one of them, correct?

 4   A   She was.

 5   Q   And with respect to this case, Ms. Weinberger's name came

 6   up again, correct?

 7   A   Yes.

 8   Q   And specifically you were accused by Mr. Brodsky of having

 9   intimidated Ms. Weinberger at her home, right?

10   A   I was accused of, yes, some type of vandalism to her

11   property.

12   Q   Do you recall the date that that was alleged to have taken

13   place?

14   A   I don't recall the actual date.  I apologize.

15   Q   Would it be fair that it was alleged to have occurred on

16   February 4th, 2017?

17   A   Yes.

18   Q   Where were you on February 4th, 2017?

19   A   Well, on the date that I was accused of this happening, I

20   was -- it was in the evening, and I was at home.  I was

21   actually ill.  I'm currently doing -- or I was currently

22   working on a project doing inspections for Fiat Chrysler of

23   America in Indiana.  I came home the day before, and I was ill

24   like with a flu or something, and I was just out of it laying

25   in my chair in the living room.

Szczesniak - Direct by Northcutt

1    Q    Okay.  And how far is your home from where Ms. Weinberger
2    lives?
3    A    I think we figured it out.  It's about an hour and
4    ten-minute drive.
5    Q    Were you ever arrested by the Dwight Police Department,
6    which is -- to be clear, Ms. Weinberger lives in Dwight,
7    Illinois.
8    A    Yeah.  No, I never was arrested by the -- I was never even
9    contacted by the Dwight police.
10   Q    Were you ever questioned by the police?
11   A    No.
12   Q    You're aware that she had claimed that it was you by name
13   that was in her backyard, correct?  Or in the alley adjacent to
14   her backyard, correct?
15   A    Well, in an affidavit I was in one place, and in the police
16   report I was in another, but yes.
17   Q    And specifically in the police report, she had said that
18   you were in an alley, and in the affidavit she claimed that you
19   were in her backyard, right?
20   A    Yes.
21   Q    So to be perfectly clear, and under oath, did you damage
22   Ms. Weinberger's fence?
23   A    No.
24   Q    Were you lurking in her alley?
25   A    No.

Szczesniak - Direct by Northcutt

1   Q   Were you anywhere even close to Dwight, Illinois on the day
2   this happened?
3   A   No.  I was in my living room sitting in the chair that I
4   usually sit in.
5   Q   Now, you're also aware that Mr. Brodsky accused you of
6   sending anonymous faxes from a place in Evanston, right?
7   A   Yes.
8   Q   Did you do that?
9   A   No.
10  Q   Do you have any specific recollection of that day?
11  A   Yes, I do.  I was driving my mother from her home in Willow
12  Springs, Illinois, to a doctor's appointment in Hinsdale,
13  Illinois.
14  Q   Okay.  And when you say the mother, this is a real living
15  person, your mother?
16  A   Yes, she is.
17  Q   And the doctor, this is an actual doctor that you took her
18  to?
19  A   Yes, it is.
20  Q   All right.  Did you invent this doctor as an alibi for your
21  whereabouts when you were sending Mr. Brodsky faxes?
22  A   No.
23  Q   Did you forge any doctor's notes?
24  A   No.
25  Q   Now, having to defend yourself in this case, you submitted

Szczesniak - Direct by Northcutt

1    an affidavit of your son -- or Mr. Lubin submitted it and you

2    obtained it?

3    A    Yes.  Both my son, as well as an affidavit from my wife,

4    that I was home that evening ill.

5    Q    Okay.  And when you say home that evening ill, that would

6    refer to the day when Mr. Brodsky said that you were damaging

7    fences in Dwight, Illinois.

8    A    That's correct.  And then my wife also submitted an

9    affidavit.  In the same affidavit in my wife's was that I was

10   picking her up after I dropped my mother off from the doctor's

11   appointment in LaGrange where she works.

12   Q    And with respect to the day when you were supposedly

13   sending Mr. Brodsky anonymous faxes, did you invent any

14   doctor's notes?

15   A    No.

16   Q    And you also submitted Luke's affidavit in support of your

17   whereabouts?

18   A    Yes.

19   Q    You have read the pleadings that Mr. Brodsky filed

20   suggesting that perhaps Luke is not an actual person.  Is Luke

21   really your son?

22   A    Yes, he is.

23   Q    And he's a living, breathing person.

24   A    Yes, he is.

25   Q    You didn't make him up?

Szczesniak - Direct by Northcutt

1    A    No, I did not.

2    Q    Have you filed any false affidavits in this case in any

3    respect?

4    A    No, I have not.

5    Q    Have you been involved in any criminal enterprise in this

6    case --

7    A    No, I have not.

8    Q    Let me finish the question.

9             (continuing)  -- in any respect?

10   A    No, I have not.

11   Q    I want to talk to you, Mr. Szczesniak, about the effect

12   that this case has had on you, specifically Mr. Brodsky's

13   conduct.

14            Have you as an expert ever had to get independent

15   counsel to defend yourself against an accusation of criminal

16   conduct?

17   A    No.

18   Q    How did that make you feel?

19   A    Well, it was pretty intense.  It was -- first of all,

20   myself personally, it took a little bit of a toll, because I've

21   been trying to establish myself -- I've only been doing this

22   for six years, and I think -- or seven years now, and I think

23   I've been doing a pretty good job at it, and my reputation was

24   pretty decent.  And it really bothered me because I wanted to

25   keep pursuing the business I was doing with the manufacturers.

Szczesniak - Direct by Northcutt

1    I found it to be much more interesting and much more concise

2    and compartmentalized, and it was good for my career, you know,

3    doing this.  I'm looking for a change.  And it really hurt me

4    when I had to call Fiat Chrysler, the attorneys that were

5    referring me the work, or I had to call other consumer

6    attorneys that I work for and tell them that I was accused of

7    this.  I mean, it -- you know, I said if you -- if you have to

8    send some work to someone else, you're going to have to do it

9    for a while because I have to concentrate on this.

10           And it really took its toll on me, especially my home

11   life.  My wife does not like stress.  She's never liked stress,

12   any type of stress at all.  And that's probably why I chose the

13   business path I did choose.  And it really put a lot of stress

14   on our marriage and as well as, you know, teen-age boys are

15   impossible to manage anyway.  And my wife and I, you know,

16   struggling to manage somebody that's becoming an adult and

17   everything at one time, it was a lot of stress.

18   Q   Was your wife made aware of the fact that you were accused

19   of criminal conduct in a federal court?

20   A   I had to make -- I made her aware the minute I asked her

21   for the affidavit.

22   Q   Was your wife made aware that an attorney had asked that

23   you be criminally prosecuted by the United States Attorney's

24   Office?

25   A   Yes.

Szczesniak - Direct by Northcutt

1    Q    Were your sons aware of this?

2    A    Yes.

3    Q    Did you lose any business as a result of Mr. Brodsky's

4    conduct?

5    A    I -- I did lose some business.  I do believe I lost

6    business.

7    Q    Explain why.

8    A    Well, I -- you know, when I told the attorneys about what

9    occurred, and then, of course, they, you know, read some

10   information in the newspaper about it, and, you know, they knew

11   what was going on.  It's a small community.  There's not many

12   experts in the United States that do this.  And I think it's

13   cost me some business.  I think it's especially cost me

14   business with the manufacturers that I was working for out of

15   state.  I really -- there's -- when I told them, I said, you

16   know, don't send me any cases for a while.  I don't know if

17   they found someone else or if they just don't have any cases,

18   but I -- I haven't gotten any new cases, which has been a long

19   time, because I was getting about two a month since maybe

20   December of last year.

21   Q    Has there to this day ever been a formal retraction spread

22   of record that the allegations that were made by Mr. Brodsky

23   against you of criminal conduct are false?

24   A    No.

25   Q    Has he ever apologized?

Szczesniak - Direct by Northcutt

1    A    No.

2    Q    Mr. Szczesniak, as you sit here today, is there any

3    misrepresentation that you have made to this Court, either by

4    the work that you did as an expert in this case or by

5    submissions that were submitted in your behalf?

6    A    No.

7              MR. NORTHCUTT:  Your Honor, I have nothing further.

8              THE COURT:  Do you have anything that you want to add

9    on direct from the plaintiff's side?

10             MR. MURPHY:  No, your Honor.

11             THE COURT:  Okay.  All right.  Cross-examination.

12             MR. BROWN:  Thank you, your Honor.

13             There's one -- there's -- the police -- Dwight Police

14   Department police report is included in the documents that were

15   submitted.

16             THE COURT:  Okay.  What exhibit is it, please?

17             MR. BROWN:  It's Exhibit A.  Unfortunately, it's one

18   of the filings we've sought to withdraw.

19             THE COURT:  Yes.  Okay.  But you want to use it in

20   this -- as part of this record.

21             MR. BROWN:  And not for -- not for the truth --

22             THE COURT:  Yes.

23             MR. BROWN:  -- simply to confirm that a police report

24   naming --

25             THE COURT:  Understood.  Okay.

Szczesniak - Cross by Brown

1          MR. LOPEZ:  Judge, it's attached to Exhibit 22.

2          THE COURT:  Thank you.

3                    CROSS-EXAMINATION

4 BY MR. BROWN:

5 Q   Mr. Szczesniak, I just wanted to confirm, and I believe

6 that Mr. Northcutt -- in confirming that there was a police

7 report, have you ever seen the police report?

8 A   Yes, I have.

9 Q   Okay.  I note that it doesn't spell your name correctly.

10 And you've already addressed the report.

11          MR. BROWN:  I simply would note to the Court that a

12 police report actually does exist.  Again, not for the truth of

13 the matter of what's written in the report, but the fact that

14 it existed and that Mr. Brodsky had a copy of it in terms of

15 raising those issues.

16          THE COURT:  Okay.  Thank you.

17 BY MR. BROWN:

18 Q   The only other question I have, just to reiterate again, I

19 believe you elaborated on your emotional distress.  I just want

20 to clarify.

21          Have you had any physical manifestation of emotional

22 distress?

23 A   Okay, I -- it's not my emotional stress.  It's the

24 emotional stress to my family --

25 Q   Okay.

Szczesniak - Cross by Brown

1   A   -- for being accused of this, and it was detrimental to my

2   career because I had to go tell my clients that I'm accused of

3   something I didn't do.  That's what caused me the stress.

4   Okay?

5   Q   I'm going to take you one step back, because there's --

6   they're related, but two separate issues:  Emotional distress,

7   loss of reputation.

8        And I respect that those are -- those come together,

9   but I first want to just clarify a couple issues.

10        Have you seen any professional help with respect to

11   the emotional distress suffered?

12   A   Well, the professional help I did have to seek was hiring

13   an attorney at quite the expense, and I have to pay out of my

14   pocket.

15   Q   Fair statement.

16        Any psychiatric, psychological, emotional, mental,

17   medical provider that provided assistance in any way for

18   emotional or psychological distress?

19   A   No.

20   Q   Okay.  So your only cost related to this has been hiring of

21   counsel.

22   A   No.

23   Q   Your only monetary cost associated with this has been

24   hiring counsel.

25   A   Well, I refused work as well.

Szczesniak - Cross by Brown

1    Q    Okay.  So to get along those lines, you contacted your

2    existing clients to let them know that you had been accused of

3    this?

4    A    Well, first of all, my existing clients are the actual

5    individual that the attorney represents.

6    Q    Okay.

7    A    Okay?  I'm independent.  So I contacted the attorneys that

8    refer me cases on a regular basis, and I told them what

9    occurred, or if they had contacted me, and say, Hey, I have

10   another case I need you to get into.  Or maybe I had a

11   deposition pending in a case, I had to say before we go to

12   deposition, I want to tell you about this.  And that's what I

13   would say.

14   Q    And then when you said I want to tell you about this, what

15   did you tell them?

16   A    I just told them, I says I've been accused of something I

17   did not do in federal court.  I cannot speak to the specifics

18   of it because they're quite embarrassing and they're quite

19   hurtful, and it would completely ruin the reputation that I

20   built over the last seven years.

21   Q    Did anyone express a belief that those allegations were

22   true to you?

23   A    I didn't tell -- I didn't go into specifics.  I just told

24   them that this is what was going on, and I said I can't go into

25   specifics, I don't want to go into specifics, because it's just

Szczesniak - Cross by Brown

1   ridiculous.

2   Q   You said you've represented -- you've worked with Mr. Lubin

3   on a few occasions.  More than five?

4   A   Just -- not more than ten, I don't think.

5   Q   Okay.  Have you ever opposed Mr. Lubin in a case?

6   A   He didn't do many car cases.  I don't think so, no.

7            MR. BROWN:  That's all I have.

8            THE COURT:  Okay.

9            MR. BROWN:  Thank you, your Honor.

10           THE COURT:  Any redirect on that?

11           MR. NORTHCUTT:  Nothing -- nothing based on that.

12           THE COURT:  Okay.  Then you can step down.

13           THE WITNESS:  Thank you, your Honor.

14      (Witness excused.)

15           THE COURT:  Any other witnesses from the plaintiff's

16   side?

17           MR. MURPHY:  No, your Honor.

18           THE COURT:  Okay.  Do you have any witnesses?

19           MR. BROWN:  Your Honor, we would ask that Mr. Brodsky

20   be allowed to address the Court and address Mr. Lubin and

21   Mr. Szczesniak without being called on the stand.  Just simply

22   address the Court.

23           THE COURT:  For what -- I'm doing an evidentiary

24   hearing.  So if he's going to address the Court, then it's

25   going to be under oath, so that any statements he makes would

1    be under oath, so I'm not sure how -- what you're expecting

2    here.  This is an evidentiary hearing.

3              MR. BROWN:  In truth, your Honor, I think he would

4    like to express some contrition.  We would like to not get into

5    any sort of cross --

6              THE COURT:  So not into evidence.

7              MR. BROWN:  Nothing on evidence with respect to --

8              THE COURT:  Okay.  Very well.  In that regard then, I

9    will accept that he address the Court for purposes of his

10   statement, and it would be as an officer of the court, so I

11   assume it will be truthful.

12             MR. BROWN:  Thank you.

13         (Counsel conferring.)

14             MR. BRODSKY:  Since we're making a record, for the

15   record, Joel Brodsky, I guess on behalf of myself.

16             Your Honor, following the April 12th hearing that we

17   had where your Honor made comments on the record, I've had a

18   lot of interaction with my attorney, Mr. Brown and Mr. Lopez, a

19   great deal, and we've talked a lot about what happened.  And I

20   realize that I let my frustrations get the better of me and

21   that I went too far in this -- in this case.  You know, and for

22   letting my frustrations get the better of me and going too far

23   in this case, I certainly -- and I very sincerely apologize to

24   this Court for anything that I did that caused this Court

25   concern or stress, and I certainly apologize to Mr. Lubin for

1    going too far in this case and causing him any stress or -- and

2    also -- well, regarding Mr. Szczesniak, I only was told by

3    Ms. Weinberger, was given both the police report and her -- and

4    her affidavit, and I only acted in reliance on that.  I know

5    nothing -- and I only know from Mr. Szczesniak what was in the

6    public record and nothing else.  And --

7         MR. NORTHCUTT:  Judge, I'm going to object.  If this

8    is going to be testamentary in nature, I would love to

9    cross-examine him on what he's saying now.

10        THE COURT:  Okay.

11        MR. BRODSKY:  Your Honor, this case is different than

12   other cases.  And I did take personal offense at the way

13   that -- and I shouldn't have, but I did -- take personal

14   offense at the way Mr. Lubin prosecuted the case --

15        MR. LUBIN:  Judge, I'm going to object, too, because I

16   was told it was simply going to be an apology, and that's the

17   only reason why I agreed to let him make a speech --

18        THE COURT:  Please sit down.

19        MR. LUBIN:  Okay.

20        MR. BRODSKY:  If you recall, you know, when we first

21   started out, I was overseas and I got a request to admit facts

22   when I was in Italy, but -- and so that's what I wanted to tell

23   the Court, that given that, I realize that that happened, and I

24   know I have to do better in controlling my frustrations, that I

25   can't let that come out in a proceeding, that I have to control

1    that.  And in talking with Mr. Lopez and Mr. Brown, we've come

2    with -- come with ways that I can address that in the future,

3    one of which would be calling them if we get into this

4    situation to act for counsel, and that's available to me now,

5    certainly, and I will take advantage of that.

6            Thank you.

7            THE COURT:  Okay.  Thank you.

8            All right.  Here's the situation on the statement.  I

9    will accept his statement of apology and remorse.  However, I

10   am not taking his statement regarding Ms. Weinberger and that

11   he relied only on the police report and her affidavit acting in

12   reliance on her, because that's a factual basis.  I can't take

13   that as a statement unless you're going to get up on the

14   witness stand and be under oath.  So it's stricken in this

15   regard in that it's not subjected to cross-examination.  The

16   apology, of course, is not.  That he's perfectly permitted to

17   do.

18           So let me ask the defense, do you want to have

19   testimony regarding his statement that he was only relying on

20   that?

21           MR. BROWN:  No, your Honor.

22           THE COURT:  Okay.  So then the evidence that I will

23   take in response to the Szczesniak testimony is the police

24   report.

25           MR. BROWN:  The police report and then, again, their

1    binder includes filings both ways.  Again, we would still seek
2    some guidance from the Court in what we may be able to withdraw
3    or not as we seek to resolve some of these issues.
4              THE COURT:  Okay.
5              MR. BROWN:  But now that they've been presented and
6    admittedly our filings, response filings, reply filings, now,
7    and this, certainly far from impossible, but we would want to
8    go through the entire record.  I would work with -- to decide
9    what -- if we can conclude this or after your Honor makes a
10   determination, what we may be able to do so as to address some
11   of the concerns we've talked about before in terms of
12   withdrawing those from a public record.
13             THE COURT:  Okay.  Very well.  All right.  Any other
14   evidence that the defense wants to present?  No?
15             MR. BROWN:  No, your Honor.
16             THE COURT:  Anything else that the plaintiffs want to
17   present?
18             MR. NORTHCUTT:  Not by way of evidence, your Honor.
19   We wish to be heard briefly in argument, if the Court will
20   allow it.
21             THE COURT:  Okay.  I'll give you a very short
22   argument, okay?  You may do so now.
23   CLOSING ARGUMENT BY MR. NORTHCUTT:
24             MR. NORTHCUTT:  Where, your Honor, does my client go
25   to get back his good name?

## Closing Argument - Mr. Northcutt

1      We've been in the hearing all morning now.  And as

2   I've watched Mr. Brodsky on his cell phone, listen to him sigh

3   during the testimony, and watched his attorneys march him up

4   for what was supposed to be an apology, what we hear are words

5   without true contrition.  And what we hear is an 11th-hour

6   acknowledgment that he's in trouble without a realization on

7   his part as to why he's in trouble.

8      We work in a regulated profession for good reason,

9   because, unlike a lot of folks who earn an honest wage, when

10  lawyers, when we screw up, people's lives are destroyed.  And

11  Joel Brodsky took the biggest swing you can.  He didn't just

12  try and get him fired as an expert.  He tried to have him

13  incarcerated as a criminal.  He tried to get him in a situation

14  where he had to choose between making a living, defending his

15  good name, and betraying the client who hired him for his

16  expertise.

17     This has been resisted at every level by Mr. Lubin,

18  who was trying as best he could to keep some sanity on these

19  proceedings.

20     And I recognize the Court's frustration when you've

21  got two attorneys that are going at it, and it's very hard to

22  see who is on the right side and who is on the wrong side when

23  it looks like a sandbox fight.

24     But I believe, your Honor, that the evidence has

25  evolved to the point where that decision is crystal clear.

Closing Argument - Mr. Northcutt

1    This was not a situation of two misbehaving lawyers who

2    couldn't get along.  This is a situation of a lawyer who is

3    pathologically driven to lie, to obstruct, and to misrepresent

4    a record to get the result that he wants, which is getting

5    Mr. Szczesniak off the case so he can deliver a result to his

6    client.  Victory at all costs.  Not the way it's supposed to be

7    done.

8         The proceedings here, irrespective of whatever the

9    parties wish to do with their own motions and their own

10   grievances in the underlying case -- which, mercifully, has

11   been settled -- really brings to mind a larger question:  What

12   is to be done when the very process by which justice is

13   supposed to be achieved is thwarted?  When an attorney, an

14   officer of the court, grabs the steering wheel and runs off the

15   road in a way that you can't even get to the merits of the case

16   because the personalities and the sideshows and the accusations

17   take center stage.  That is why we're here.

18        That presents a very real cost to this Court in the

19   frustration that all of us have in seeing that these

20   proceedings are concluded in an orderly way.

21        It presents a cost to the litigants, not only the

22   plaintiff, mind you, but Mr. Roche's client, who I'm sure

23   thought that by hiring an attorney, who had been so flamboyant

24   and held himself out as such a charismatic advocate, was going

25   to advocate on his behalf in a way that protected those

Closing Argument - Mr. Northcutt

1    interests.  That didn't happen.

2          But also the human cost to Don Szczesniak, who the

3    Court can tell, just by the way in which he testifies, the

4    manner in which he presented himself, is nothing but a

5    straightforward, hard-working, honest man trying to make a

6    living, who was threatened with the loss of his liberty by a

7    courtroom bully who used the trappings of this courtroom to

8    cloak himself in immunity that would protect him for what would

9    otherwise be defamatory and sanctionable conduct.

10         The one thing I can say -- and I think this really

11   enures to the credit of Mr. Brown and the attorneys who have

12   exercised a modicum of restraint in not trying to go point for

13   point in attacking the refutations of the false allegations

14   that were made by Mr. Brodsky -- is that at least we didn't

15   have to dig out of each and every rabbit hole.  That part did

16   not happen today.  And the only countervailing evidence we have

17   in what we, I suppose there's been a suggestion since there was

18   no real testimony to back it up, is that Mr. Brodsky must have

19   relied on a police report that we know is discredited, that we

20   know is contradicted by the affidavit, that we know was a

21   situation where the police didn't even talk to Mr. Szczesniak.

22         And if it were that one isolated incident, your Honor,

23   if it were only the Weinberger question, then maybe our

24   complaints might be overblown, and we could chalk this up to an

25   attorney who believed someone and just got over his skis, but

<u>Closing Argument - Mr. Northcutt</u>

1      that's not what happened.  He lied.  He lied in grand fashion.

2      And he did it in a way that, even when the Court warned him,

3      stop with the vitriolic pleadings, he wouldn't listen to you.

4      Even when two separate judges of the Circuit Court of Cook

5      County, that other court that has no rules, even when they

6      refer him to the ARDC, an experience that is usually terrifying

7      for any lawyer with an ounce of sense in him, not going to

8      stop.

9           So the question really, since the only thing that is

10     to be dealt with today really refers to the administration of

11     justice and Mr. Brodsky's role in it, is what does it take?

12          Even as he stepped up here a minute ago, he's still

13     making excuses.

14          When he gets referred to the ARDC, doesn't seem to

15     have an effect.

16          When he gets kicked off a case in Cook County by a

17     judge, doesn't seem to have an effect.

18          The Court's orders doesn't seem to have an effect.

19          And that, your Honor, is a determination that is way

20     above my pay grade.

21          As an officer of the court, I and Mr. Brodsky,

22     everybody in this room with an ARDC card, is obliged to the

23     court.

24          And so I would only ask humbly on behalf of my client

25     that the Court's consideration include that loss of good name.

Closing Argument - Mr. Murphy

1          Thank you, your Honor.

2          THE COURT:  Thank you.

3          Go ahead, sir.

4    CLOSING ARGUMENT BY MR. MURPHY:

5          MR. MURPHY:  Your Honor, the damage has been done in

6    this case.  The attorney fees have already been increased, the

7    attorneys' reputations have been sullied, and the Court's time

8    has already been wasted.  And no amount of 11th-hour contrition

9    can undo the cost that has already been caused by Mr. Brodsky's

10   conduct.

11         Mr. Brodsky and his attorneys defend against his

12   conduct on three points:

13         First, they say that he was simply overreacting.  But

14   the breadth and the number of personal attacks in this case and

15   the number of filings, the length of time, the ongoing nature

16   of the personal attacks belie any contention that this was

17   simply an overreaction or losing your cool.

18         The second point is that lots of clients depend on

19   Mr. Brodsky.  But it is the fact that there are many, many

20   litigants who rely on Mr. Brodsky, that only emphasizes the

21   need for sanctions in this case because the judicial system

22   relies on attorneys comporting themself with professionalism

23   and civility.  Otherwise, the system falls apart and grinds to

24   a halt.

25         And the third point that they defended him on was that

Closing Argument - Mr. Murphy

1    there's some sort of mutual animosity between Mr. Brodsky and

2    Mr. Lubin.  They make brief and vague references to

3    condescending remarks by Mr. Lubin.  But neither Mr. Brodsky

4    nor his attorneys have pointed out a single email containing

5    these supposed condescending remarks or supposedly baiting

6    Mr. Brodsky to lash out at Mr. Lubin.

7            Plaintiff, on the other hand, has submitted the exact

8    quotes that Mr. Brodsky has made, and the Court has the entire

9    email chains and can see and read for herself that there is

10   nothing in those email chains even remotely condescending or

11   antagonistic.

12           Another issue is whether or not Mr. Brodsky had prior

13   warning that this conduct was inappropriate or wouldn't be

14   tolerated.  And plaintiff has established that in at least two

15   prior cases Mr. Brodsky has been warned and has faced

16   retribution for unacceptable behavior.  But, most importantly,

17   in this case he was warned by the Court that any further

18   uncivil comments would be sanctioned, and he ignored that

19   warning and continued to make personal attacks against

20   Mr. Lubin.

21           And Mr. Brodsky's apology was not a real apology.

22   Even now, it was not Mr. Brodsky's fault.  It was Mr. Lubin

23   provoked him, Mrs. Weinberger gave him information and he just

24   went with it, or he just was reporting what was in the public

25   record.  Nothing in that apology took responsibility for his

Closing Argument - Mr. Brown

1  conduct.  And the Court has no reason to believe that, absent

2  sanctions, he's going to be deterred from comporting himself

3  exactly how he did in this case in future cases.

4       The Seventh Circuit has been abundantly clear when an

5  attorney needlessly multiplies proceedings, he must pay for

6  those increased costs.

7       This Court should impose sanctions for three reasons:

8       One, to maintain the dignity and decorum of the court;

9       Number two, to compensate plaintiff's attorneys for

10 the costs that have been incurred as a result of Mr. Brodsky's

11 conduct;

12      And, number three, to deter future conduct by

13 Mr. Brodsky in other cases so that other courts and other

14 attorneys will not be subject to the similar types of personal

15 attacks and false accusations and wasting of the judicial

16 resources.

17      Thank you, your Honor.

18      THE COURT:  Thank you.

19      Gentlemen?

20 CLOSING ARGUMENT BY MR. BROWN:

21      MR. BROWN:  Your Honor, I am not -- I'm not as

22 eloquent as Mr. Northcutt or as detailed as Mr. Lubin and his

23 counsel.

24      What I will say is there is real contrition.  I've

25 talked with Joel.  Joe and I both have, not just with respect

Closing Argument - Mr. Brown

1   to what happened here, but to their point, how we make sure

2   this doesn't happen again, how we get out in front of these

3   issues where he has some things going on in other cases and is

4   frustrated, and is able to not put himself in this position

5   again.

6           Recognizing that, unquestionably in this case, there

7   were some things that he needed to apologize for.

8           Again, to reiterate, these men aren't criminals.

9   They're not part of a criminal enterprise.

10          That being said, I do believe, with all due respect to

11  your Honor holding this -- holding this hearing, I think when

12  you look at the record and you look at some of the individual

13  communications, this does not rise to the level that we

14  sometimes see in terms of cases with 1927 sanctions or Rule 11

15  sanctions or Rule 30 sanctions.

16          There is a body of work here that in some ways I

17  believe is being overplayed.

18          I do not believe that these individuals' reputations

19  have been damaged.

20          I don't -- I recognize, certainly with respect to

21  Mr. Szczesniak, he's had to engage counsel, and that's

22  something different.

23          With respect to plaintiff's counsel, with a fee

24  shifting statute, there's an aspect of this case that I feel

25  like they may be overplaying the fees associated with this in

Closing Argument - Mr. Lopez

1    order to get that home-run fee award, the retirement fee award.

2         That being said, unquestionably they spent some time

3    dealing with these sanctions issues, and we recognize that.

4         We believe that when you review the record, what was

5    filed yesterday, that you'll find that sanctions aren't

6    appropriate here and that the fees can be addressed in the fee

7    petition.

8         Thank you, your Honor.

9         THE COURT:  Okay.  Mr. Lopez?

10   CLOSING ARGUMENT BY MR. LOPEZ:

11        MR. LOPEZ:  Judge, the only thing that I want to

12   really add is that we have had many discussions with

13   Mr. Brodsky and questioned why he acted in such a manner.  They

14   can be characterized, I guess, as being way over the top.  I

15   don't know how else to characterize it, especially with

16   Exhibit 22, which is the motion that he filed before the Court

17   requesting that the witness be prosecuted for whatever he

18   perceived it to be.  And I understand the witness' -- I mean,

19   I've been on the receiving end of many different things, and I

20   know how it is, and it might be hard for him in the future, and

21   we understand it, because wherever the expert goes, people are

22   going to do their due diligence and look in and see if there's

23   anything against that expert, and I think that's one of the

24   reasons why Mr. Brodsky and his other counsel spoke to

25   Mr. Northcutt and wanted to withdraw those items from the

Closing Argument - Mr. Lopez

1   record to protect the reputation of this expert witness

2   because, again, whenever I have an expert witness on the other

3   side, I'm going to Google him, I'm going to go onto Pacer, and

4   I'm going to look to see if there's anything out there.

5          And I think that Mr. Brodsky is on the right track, so

6   to speak, by requesting that, not so much to save himself from

7   any sanctions, but more so to save the reputation of the expert

8   witness that he's now come to the realization that the

9   affidavit that he relied on was incorrect or there was some

10  personal animosity between the two, and that in order to make

11  the situation whole again, that these pleadings should be taken

12  off the record so they don't follow this expert witness from

13  courthouse to courthouse.  And I think that that's a good

14  thing, and I think that shows to the Court the first step

15  towards trying to make this right somehow for this conduct.

16         And, you know, we talk about general deterrence.  We

17  always talk about specific deterrence.  This case has been

18  reported by the press.  A lot of lawyers are reading it, and a

19  lot of lawyers are going to see what is going to happen to

20  Mr. Brodsky, and a lot of lawyers are going to probably tone

21  down some of their rhetoric, hopefully, that is similar to this

22  by the realization that, hey, this is an important thing and

23  this can become part of a public record and I could be

24  disgraced.  He's been embarrassed, obviously, by the reporting

25  of this.  And that's something that he -- that I think drives

Closing Argument - Mr. Lopez

1    him to try to change the way he practices law on these civil

2    cases.  And I think that that's what we're really -- I think

3    we're all interested in getting Mr. Brodsky to comply with

4    rules and regulations.  And not only Mr. Brodsky, but every

5    other lawyer who litigates a case, whether it's in state court,

6    federal court, Illinois, it doesn't matter, everyone is going

7    to read about it.  We're trying to figure out how to stop this

8    conduct in the future.  I think that's one of the reasons why

9    they have these sanctions statutes is to be able to have

10   something so that you can stop attorneys from getting

11   overzealous and to having, you know, these types of exchanges

12   between one another.

13          If you look on the internet about attorneys, you see

14   attorneys have fistfights with each other and arguments in the

15   hallway, all kinds of crazy things that seem to be uncivil.

16   And you can probably remember many years ago, we didn't even

17   have a code of civil -- civility here in this district until

18   the Court decided to take it on, make a committee, and have

19   these rules to try to get lawyers to conform.

20          So I think that Mr. Northcutt is right that we are --

21   we are officers of the court, and we should treat one another

22   with respect.  And I think that's -- I think that's how it

23   should be.

24          And I think that we should be able to come in here and

25   fight as hard as we can against one another, say whatever we

Closing Argument - Mr. Lopez

1    want against one another, and then walk out that door and be

2    able to joke or go to Starbucks or just talk.

3           And I always tell young lawyers this is like a sport.

4    This reminds me when I was a kid and you had to fight your best

5    friend at the park district.  You went into the ring, you did

6    it, you came out of the ring, and you were still friends.  And

7    that's how it should be.  That's civility between lawyers.  And

8    I think that's what we all strive for.  And that's what we keep

9    telling Joel:  You can't attack the other lawyer.  You attack

10   the case and you attack the facts, but don't attack another

11   attorney because that is uncivil in nature.  And that's how it

12   works here.  And Mr. Brodsky is now to this realization,

13   finally, I guess after numerous warnings and whatever,

14   according to them, that this is the type of conduct that's to

15   be expected of an attorney.  And I think that's the important

16   thing.

17          And, again, Mr. Northcutt is right.  We should be able

18   to come in here and beat each other up in front of the podium,

19   in front of the judge, with our legal arguments and walk out in

20   that hallway and be civil to one another.  That's what I would

21   like to see happen.

22          And I think that Mr. Brodsky has the realization that

23   this is not -- sometimes lawyers, I think, they take these

24   things too personal.  And you hear -- I hear people say I don't

25   like that prosecutor because -- well, the lawyers are doing

Closing Argument - Mr. Lopez

 1   their jobs.  And you're never going to agree with the other

 2   side, I understand that.  You're both on different sides.  But

 3   there's no reason to have personal animosity against your

 4   opponent.  And that's what we're here for:  To curb this

 5   overenthusiasm of lawyers, not just Mr. Brodsky, but there's

 6   other attorneys, too, that need to be deterred.  And they're

 7   going to read about this and see about this, and we think it's

 8   important.

 9        But, more importantly -- and Ryan is -- you know, Ryan

10   is kind of a voice of reason to Mr. Brodsky, and we've

11   discussed this with Mr. Brodsky numerous times, and we think

12   that he's going to go in the right direction.

13        So we ask the Court to take that into consideration.

14   And we ask the Court to take a look at the documents.  And,

15   again, I adopt whatever Ryan said.  And we will continue on

16   with our consultation of our client, and hopefully we can -- we

17   can make a good resolution with all the other attorneys to get

18   past the fee issues and what other issues and withdrawing these

19   to protect Mr. Northcutt's client, which I think is important,

20   and we're going to continue to work in that direction.

21        THE COURT:  Okay.  Thank you, Mr. Lopez.

22        All right, folks.  Did anyone want to rebut?  It's

23   very short, if you want.

24        MR. NORTHCUTT:  Very briefly.

25        THE COURT:  Okay.

Rebuttal Argument - Mr. Northcutt

1    REBUTTAL ARGUMENT - MR. NORTHCUTT

2        MR. NORTHCUTT:  Your Honor, in a sure sign that the

3    apocalypse is upon us, I want to say that I agree with and echo

4    a lot of what Mr. Lopez actually said.  He had referenced the

5    Supreme Court Commission on Professionalism.  I'm proud to be a

6    member of that commission.  And the whole purpose of that is to

7    avoid courtroom proceedings like this.

8        But this isn't the case of just incivility and how do

9    we deal with lawyers that aren't playing along.  There is a

10   very human cost here, which I've belabored.

11       And for as long as Don Szczesniak is going to be an

12   expert, for as long as those pleadings which Mr. Lopez has

13   referenced -- and I think, to his credit, rightly said should

14   be withdrawn from public record -- there's not a deposition

15   that he's ever going to have where opposing counsel isn't going

16   through that one by one and he's not going to have to relive,

17   "So you were accused of criminal conduct, in fact, someone

18   asked a federal judge to get the U.S. Attorney's Office to

19   prosecute you."  That's his reality.

20       So while I agree with the idea that we should all

21   fight like cats and dogs and walk out the door like pals, that

22   is ideal.

23       We're beyond that.

24       Thank you, your Honor.

25       THE COURT:  Okay.  Any short rebuttal?

Rebuttal Argument - Mr. Murphy

1      MR. MURPHY:  Just one point, your Honor.

2    REBUTTAL ARGUMENT BY MR. MURPHY:

3      MR. MURPHY:  I agree with everything that Mr. Lopez

4    said about we have rules in place, we have systems in place, to

5    ensure that attorneys comport themselves properly and engage in

6    proper conduct.  But those rules and those systems only have

7    the deterrent effect if they're enforced.  And that's what

8    we're asking the Court to do in this instance.

9      Thank you.

10     THE COURT:  Okay.  Thank you.  All right.  Thank you,

11   everyone, for your presentations.  I hope you have a nice

12   weekend.  I'll take it under advisement.

13     LAW CLERK:  All rise.  Court is adjourned.

14    (Proceedings concluded at 11:58 a.m.)

15                   C E R T I F I C A T E

16    I certify that the foregoing is a correct transcript of the

17   record of proceedings in the above-entitled matter.

18

19

   _/s/ GAYLE A. McGUIGAN_____          _July 19, 201_7

20   Gayle A. McGuigan, CSR, RMR, CRR               Date
     Official Court Reporter

21

22

23

24

25