IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Donaldson Twyman, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 16 C 4182 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| S&M Auto Brokers, Saed Ihmoud, and | ) | |
| Mohammed Ihmoud | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This is an odometer rollback case that landed in federal court due to a little known federal statute that federalized the crime of manipulating a car's odometer in order to protect purchasers from potential shady practices committed by used car sellers. This small Federal Odometer Act case began in April of 2016 and burgeoned into an 18-month battle between defense counsel, Joel Brodsky, and Plaintiff's counsel over the purchase of a $35,000 used SUV from S&M Auto Brokers ("S&M").. The Plaintiff, Donald Twyman alleged that S&M failed to inform him that the Infiniti SUV had been in a serious accident, had been rebuilt, and the odometer had been rolled back. After the car drove poorly, Twyman brought it to a local Infiniti dealer who reviewed the warranty claim history that showed a discrepancy in the odometer readings and that the car had been in an accident. Twyman filed suit alleging a violation of the FOA and that S&M committed fraud and violated the Illinois Consumer Fraud and Deceptive Business Practices Act when it failed to disclose that the SUV had been damaged in an accident.

Plaintiff's attorney and Brodsky are no strangers to each other or this type of litigation. Plaintiff's attorney filed a complaint that not only accused S&M of violations pertaining to Twyman's purchase but also alleged that S&M has "a pattern and practice of selling

1

unmerchantable wrecks with substandard repairs and concealing or misrepresenting material facts." The Court inquired about the ability to resolve what the Court perceived to be a finite and discrete case with few issues and Plaintiff's attorney informed the Court that he would be seeking punitive damages and that the case was valued at an amount much greater than the value of the car. Brodsky responded in kind that Plaintiff's attorney is essentially in the business of extorting clients like S&M and that he just files these lawsuits over and over when there is no basis for doing so. And so the battle began.

Now one would think that a federal judge would not hear parties square up so heatedly at their first appearance before the Court, but unfortunately, that is not always the case. Yet, the Court has an obligation to protect not only the legal process but also the clients who are represented by the litigants which is why district court judges have initial status hearings and question the lawyers about the cost of litigation and the value of an award. Recognizing the Court's inherent authority to control those litigation costs, the Court immediately clipped the wings of the lawyers by refocusing them to the reality of their dispute:

> So you can all go and interview all of these people and bills tens of thousands of dollars to do discovery on the case, and you hire an expert and pay that expert another 10 or 20 thousand dollars. . . all over a dispute that has probably much less value than the 56 [thousand] that the plaintiff has demanded in settlement. So you all need to be lawyers and recognize that you have clients that have concerns. He's got a car that he doesn't think works well . . .and you've got a dealership that is going to spend an awful lot of money defending it. I think you both need to sit down at the table and discuss this.

Status hearing 6/30/17.

The Court then limited the discovery period to a period of three months so as not to have the lawyers expend too much money taking into account Fed. R. Civ. P. 26 and the need to

balance the proportion of the costs of litigation with the value of a potential award in Plaintiff's favor.

Shortly thereafter, the parties appeared again. This time to argue over when and where depositions would take place. Brodsky informed the Court that he would be in Florence, Italy at his vacation home for one month and sought an extension of time to respond to various motions and discovery which the Court granted. During this status, Brodsky accused Plaintiff's counsel of "recidivist conduct" because "he has filed three other lawsuits" for the same type of claim. The Court managed to calm the parties down once again and once again instructed the lawyers talk to each other before filing motions and to allow for lawyers to take vacations. Within days, the parties were battling about requests to admit which Plaintiff's counsel filed and noticed to be heard when Brodsky returned from his vacation and the Court entered its first written warning to act reasonably and professionally. (Dkt. 35 "The parties should act professionally instead of antagonistically toward each other and recognize that as officers of the Court they are expected to treat each other reasonably and professionally.")

Unfortunately, that first shot across the bow from the Court had little effect on Brodsky nor did his vacation in Italy. Within days of his return, he filed a motion for protective order seeking to bar Plaintiff from issuing document subpoenas, and striking Plaintiff's Third Set of Interrogatories and, Requests for Production and Requests to Admit because "Plaintiff does not consider a lawsuit as a way to redress a legitimate grievance by uncovering the truth and applying the law, but instead considers it to be a profit making, fee generating, enterprise for attorneys." (Dkt. 41 at 8.) Brodsky requested that the Court award him reasonable fees for having to bring the motion. In response, Plaintiff set forth the requests he had made to Brodsky, all within the Federal Rules of Civil Procedure, all relevant to proving his case, and how Brodsky

3

had responded to his email requests by calling Plaintiff's counsel "an extortionist" who is "really obsessed" and refusing to comply with Plaintiff's discovery requests. (Dkt. 45).

Although the nature of the dispute between the parties was limited to a narrow factual and legal issue, the conduct of Joel Brodsky, soon overshadowed the legal case and became the focus of numerous court hearings. In the eighteen months since Twyman filed his lawsuit, the docket includes well over 200 docket entries, nearly three quarters of them attributable to disputes regarding Brodsky's behavior defending the suit. The parties filed a number of requests for sanctions throughout the litigation and the Court admonished Brodsky multiple times to curb his uncivil and vitriolic conduct. Finally, the Court conducted a hearing regarding allegations that Brodsky made against Plaintiff's expert witness and the Court warned that sanctions may result if the Court determines that the allegations were frivolous or bought in bad faith.[1] Based on his conduct throughout the course of this lawsuit, and as explained in detail below, the Court invokes its inherent authority to sanction Brodsky.

## BACKGROUND

Throughout the course of the litigation, the Court has observed first-hand Brodsky's unprofessional, contemptuous, and antagonistic behavior directed at opposing counsel. These have included false accusations and inappropriate diatribes in pleadings, where he repeatedly accused opposing counsel of lying, extortion, attempting to create a false record, and repeatedly

---

[1] Brodsky also moves to strike the binder of exhibits that Plaintiffs submitted to the Court after the hearing alleging that he did not see them nor did he have a chance to object. Ninety percent of the binder comprises docket entries and exhibits already on the docket and submitted or discussed during the hearing. A very small amount of unrelated emails are also presented which simply show a pattern of name-calling, nasty remarks about litigants and a general obstructionist litigation strategy in other cases. To the extent that some of the pattern was argued in Court to show that Brodsky's behavior in this case was not an anomaly, the Court accepts the argument; however, does not rely on any materials that were not part of this case and the behavior engaged in by Brodsky in this case. In short, the motion to strike the exhibits is denied in part and granted in part. [212] The emails unrelated to this case are stricken.

4

requested sanctions without any good-faith basis. (*See, e.g.*, Dkt. Nos. 67, 106, 138, 151, 155.) Brodsky also sent numerous vitriolic emails to opposing counsel during the course of the litigation, including asking opposing counsel "How do you even call yourself a lawyer? You are an embarrassment to the profession," and accusing him of being an extortionist and manufacturing the case. (*See, e.g.*, Dkt. 166-1). This pattern of behavior continued at a deposition of one of Defendants' experts. There, Brodsky was confrontational and antagonistic and made numerous speaking objections, improperly instructed the witness not to answer, in addition to cursing several times on the record (Dkt. 160 at 58:19, 73:21), making several inappropriate ad hominem attacks against opposing counsel, including calling him a liar (*id.* at 71:21-22), and accusing counsel of engaging in a criminal enterprise (*id.* at 122:6-19).

Ironically, in many of his diatribes, Brodsky has accused opposing counsel of over-litigating what he often referred to as a "small-claims" case, yet Brodsky filed a number of baseless or unnecessary motions himself prolonging the litigation and the costs of litigation. These include a motion opposing plaintiff's ministerial motion to correct a typo in his expert's report (Dkt. 62); a motion *in limine* seeking the Court initial review of whether Defendant's expert reports were sufficient (Dkt. 96); a frivolous motion to strike Plaintiff's Rule 56 statement; and a baseless motion to seal a recording of the deposition referenced above in order for it not to be accessed on the public record. (Dkt. 162).

Of special concern for the Court, however, are allegations Brodsky leveled at Donald Szczesniak, Plaintiff's expert witness. In his reply in support of his motion *in limine* regarding expert witnesses (Dkt. 102), Brodsky leveled charges against Szczesniak for allegedly fabricating an expert report in an unrelated matter involving Diane Weinberger. Two and a half weeks later, Brodsky filed another motion regarding Szczesniak, this time asserting that

5

Szczesniak had damaged Weinberger's fence. (Dkt. 108.) That motion also raised a number of alleged unrelated civil judgments against Szczesniak, relating to his auto repair business. (*Id.* at 3.) The motion also accused Szczesniak of sending Brodsky an anonymous facsimile transmission of a newspaper article in an "attempt to intimidate the Defendants [sic] attorney from further searching into his background." (*Id.*) This motion sought an order of "indirect criminal contempt" against Szczesniak and sought to have the Court make an immediate referral to the United States Attorney for a criminal investigation to be launched against Szczesniak. (*Id.* at 4.) The Court summarily rejected Brodsky's motion and reminded him that there were proper ways to challenge an expert, none of which were followed, and that if he believed that criminal activity occurred, he himself could call the USA and make a complaint. (Dkt. 110.) Nonplussed by the Court's refusal to act as his bully, Brodsky filed a motion seeking sanctions against Szczesniak and against Plaintiff for retaining him. (Dkt. 121.) Brodsky's motion for sanctions again accused Szczesniak of attempting to intimidate Weinberger by threatening her and purportedly damaging her fence. Rather than file a motion seeking to bar the expert testimony pursuant to the Court's gatekeeping function in Daubert, Brodsky instead simply sought an order barring Szczesniak from testifying due to his alleged improper and even illegal behavior. (*Id.* at 4.)

Plaintiff responded to Brodsky's motion for sanctions, asserting that Brodsky's accusations were false and attached affidavits from Szczesniak, his wife, and son Luke who all attested that Szczesniak was home sick at the alleged time Weinberger's fence was damaged. Plaintiff's response also pointed out inconsistencies in the story Weinberger told the police as compared to the affidavit she completed for Brodsky, including Szczesniak's alleged location on the night of the incident and the timing of the incident. (Dkt. 137 at 3.) In fact, there is no

evidence that Szczesniak was ever questioned by police in the matter, let alone arrested. Plaintiff also denied Brodsky's allegation that Szczesniak anonymously faxed him an article, pointing out that Brodsky's affidavit was not grounded in facts, and submitted sworn testimony that Szczesniak was taking his elderly mother to the doctor at the time the fax was sent. (*Id.* at 5.)

In the face of evidence contradicting his motion for sanctions, Brodsky again doubled-down. In his reply, he called Szczesniak a liar and accused Szczesniak of submitting a false declaration and committing perjury. (Dkt. 138 at 2.) To use his own words against him, "in what can only be described as strange and bizarre" Brodsky asserts that "an examination of the LexisNexis public records search that was done on Donald Szczesniak, states that while he does have a wife named Jennifer, a mother named Ruth Ann, and a son named Zachery, there is **no** son named Luke." (*Id.*) Brodsky went on to insinuate Szczesniak had fabricated the affidavit filed by Luke and that he indeed had fabricated Luke. Brodsky then went on to accuse Plaintiff's counsel of bringing the lawsuit "to extort money, based entirely on false evidence, and an expert who is [sic] tampers with witnesses and presents false declarations and/or engages in false lawsuit . . . is no small matter." Meanwhile, Szczesniak, a proposed witness in the matter, sought representation based on the allegations against him that went to the heart of his work – testifying as an expert in odometer fixing cases. Szczesniak appeared in Court with his retained personal attorney and sought leave to file a response to the accusations against him. Rather than back down, Brodsky opposed his efforts to file a response and increased his level of accusations against the witness, this time alleging that the instant case was "not the first case in which Szczesniak has fabricated persons and events in affidavits filed with the Court, nor is it the first time he has been accused of witness intimidation. It appears to be a habit." (Dkt. 142 at 1.) The Court permitted Szczesniak to file a response to defend his reputation and Brodsky filed

7

another reply, again accusing Szczesniak of damaging Weinberger's property and fabricating his expert report, along with other allegations of impropriety regarding unrelated cases. (Dkt. 150.)

Following this flurry of serious allegations, the Court held a status on April 6, 2017. At that status hearing, the Court again reminded the parties that it was considering sanctions based on the conduct of counsel and noted that the filings were the most acerbic and nasty accusatory filings the Court had ever seen. Despite these warnings, Brodsky continued to impugn Szczesniak and claim that the case was fabricated in open court. The Court ordered counsel to bring their clients to the next status, which was held six days later. At that status, the Court informed the parties of the need for a sanctions hearing regarding Brodsky's accusations and asked the parties whether they were aware of the protracted proceedings and why they were taking so long to deal with such a minor dispute. Brodsky's client informed the Court that he was unaware of the ethical issues and had never been conveyed an offer to settle the suit – something he was willing to do long ago. (Dkt. 165.) Following the April 12, hearing Plaintiff filed a motion for sanctions. After retaining counsel, Brodsky filed a motion to withdraw his filings involving accusations against Szczesniak. (Dkt. 172.) He also withdrew from representing S&M. Shortly before the hearing, Brodsky filed a short response and the sanctions hearing was held on July 7, 2017. In his response, he denied that any of the filings were submitted for an improper purpose and highlighted his efforts to "address issues raised by the Court." (Dkt. 208.)

At the hearing, which lasted several hours, the Court heard testimony from Peter Lubin, lead counsel for Twyman, and also testimony from Szczesniak. Lubin testified regarding his good-faith basis for filing the lawsuit, discussed Szczesniak's integrity and qualifications, denied being in a criminal enterprise (a rant that Brodsky repeated throughout his filings), and discussed

the emotional distress he suffered from Brodsky's poor treatment.  Szczesniak testified about the importance of his reputation to his work as an expert witness, denied damaging Weinberger's fence, denied sending Brodsky an anonymous fax, and confirmed that he has a son named Luke. Szczesniak also averred that Brodsky's filings had damaged his employment and put undue stress on his family.  Brodsky declined to testify but gave a statement where he said he let his frustrations get the better of him and that he "went too far in this case."  Brodsky also apologized to the Court "for anything that [he] did that caused this Court concern or stress" and apologized to Lubin for "going too far in this case" and also to Szczesniak.  Brodsky did not submit any evidence contradicting Lubin's or Szczesniak's testimony nor did he provide any explanation for his behavior throughout the case, including the allegations against Lubin and Szczesniak. Although not reflected on the transcript, throughout the hearing, Brodsky was occupied with his cellular phone and made several audible exasperated sighs during the course of the hearing as the testimony was being presented.

Outside of the events leading up to the sanctions hearing, the Court warned Brodsky several times that his behavior could result in sanctions.  (*See, e.g.*, Dkt. 118; Dkt. 165 (informing the parties that the Court has reviewed the docket and the need for a sanctions hearing because "Mr. Brodsky has been overly aggressive in this case, that he's not following the rules of professional conduct, and he is filing a lot of motions to exacerbate the discovery process.  And so it's going to be a [sanctions hearing] primarily to determine whether sanctions should be applied to him" and noting the seriousness of the accusations Brodsky made against Szczesniak but noting that the Court has "no problem levying the appropriate sanction against a lawyer who misrepresents or lies to the Court in such a manner as to hijack a litigation"); Dkt. 216 at 9-10 (warning the parties that settlement of the matter, including attorneys' fees would not moot the

9

Court's desire to consider sanctioning counsel, because the "Court always has jurisdiction over protecting the integrity of the proceedings before her" and that the Court intended to "protect the integrity of this courtroom").)

## LEGAL STANDARD

### I. The Court's Inherent Authority to Sanction

"A district court has inherent power to sanction a party who 'has willfully abused the judicial process or otherwise conducted litigation in bad faith.'" *Secrease v. W. & S. Life Ins. Co.*, 800 F.3d 397, 401 (7th Cir. 2015) (quoting *Salmeron v. Enterprise Recovery Systems, Inc.*, 579 F.3d 787, 793 (7th Cir. 2009)). These sanctions are appropriate where a party or their counsel has practiced fraud upon the Court, acts in "bad faith by delaying or disrupting the litigation," hampers enforcement of a court order, or when a party is responsible for defiling "the very temple of justice." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991) (quotations omitted). "This power is 'permissibly exercised not merely to remedy prejudice to a party, but also to reprimand the offender and to deter future parties from trampling upon the integrity of the court.'" *Flextronics Int'l, USA, Inc. v. Sparkling Drink Sys. Innovation Ctr. Ltd.*, 230 F. Supp. 3d 896, 906–07 (N.D. Ill. 2017) (quoting *Salmeron*, 579 F.3d at 797).

Due to "their very potency, inherent powers must be exercised with restraint and discretion," but "[a] primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers*, 501 U.S. at 44-45. These powers should be invoked when "in the informed discretion of the court, neither [a] statute nor the Rules are up to the task." *Id.* at 50. This authority includes circumstances where "conduct sanctionable under the Rules was intertwined within conduct that only the inherent power could address," because "requiring a court first to apply Rules and statutes containing sanctioning

provisions to discrete occurrences before invoking inherent power to address remaining instances of sanctionable conduct would serve only to foster extensive and needless satellite litigation, which is contrary to the aim of the Rules themselves." *Id.* Therefore, "the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." *Id.* at 49.

Attorneys can be sanctioned pursuant to the Court's inherent authority. *Carr v. Tillery*, 591 F.3d 909, 919 (7th Cir. 2010) ("A court has inherent power, which is to say a common law power, to punish by an award of reasonable attorneys' fees or other monetary sanction, or to prevent for the future by an injunction, misconduct by lawyers appearing before it."). Indeed, severe sanctions can be imposed against attorneys pursuant to the Court's inherent authority when an attorney acts in bad faith. *See Salmeron*, 579 F.3d at 793 (affirming sanction of dismissal with prejudice after court found that attorney acted in bad faith). "[B]efore a court may impose sanctions *sua sponte*, it must give the offending party notice of its intent to do so and the opportunity to be heard." *Johnson v. Cherry*, 422 F.3d 540, 551 (7th Cir. 2005)

## **DISCUSSION**

Our legal system provides ample opportunities for litigants to vociferously challenge the testimony of expert witnesses. Brodsky, however, never availed himself of the tools available to him to legitimately challenge the qualifications or opinions of Szczesniak. Instead, he resorted to inflammatory, unsubstantiated, and false allegations against Szczesniak. Brodsky's allegations against Szczesniak were made in bad faith, in an attempt to improperly impugn Szczesniak's reputation before the Court, to have the Court potentially disqualify him as an expert, or at least intimidate Szczesniak to the extent he would not testify. These acts of intimidation and harassment, included allegations of improper conduct in unrelated matters, allegations related to

11

Szczesniak's personal litigation history divorced of any relevancy to this matter, and unsubstantiated and even false claims of intimidation.

Brodsky attempts to shield his conduct by pointing to the police report and affidavit of Ms. Weinberger. His alleged reliance on Ms. Weinberger, however, is unavailing. Apparently relying on Ms. Weinberger's allegations that Szczesniak damaged her fence, Brodsky asked this Court to find Szczesniak in criminal contempt and refer the matter to the United States Attorney. This was wildly inappropriate and an attempt to harass Szczesniak and poison the Court's view of him. First, Ms. Weinberger's purported allegations against Szczesniak have nothing to do with this matter and even if her allegations were substantiated, they are irrelevant to his testimony as an expert witness before this Court. Second, based on testimony and evidence adduced at the sanctions hearing, Ms. Weinberger's allegations against Szczesniak are unsubstantiated. There are material inconsistencies between her police report and the affidavit she provided to Brodsky, and there was uncontroverted testimony that Szczesniak was at home at the time of the alleged incident with his family. Furthermore, there is no evidence that Szczesniak was ever questioned in the matter, let alone arrested. Third, if Brodsky was aware of criminal conduct by Szczesniak he could report it to the proper authorities; there was no reason other than to harass and intimidate for him to bring the allegations to the Court's attention. Fourth, even if it were somehow appropriate to bring Ms. Weinberger's allegations to the attention of the Court, Brodsky apparently failed to investigate their veracity.

Brodsky's allegations regarding Ms. Weinberger were not the sole basis for his request for his request for holding Szczesniak in criminal contempt or for barring his testimony. He also submitted his own allegations and later an affidavit, completely divorced from fact and reality alleging that Szczesniak attempted to intimidate him by sending an anonymous fax to his office.

12

First and most importantly, there is no evidence that Szczesniak sent Brodsky the fax. In fact, this notion was disproven at the hearing and Brodsky failed to submit any evidence to allow the Court to come to another conclusion. The only reason the Court can see to explain why Brodsky would make such an allegation, which was made under penalty of perjury, was to harass Szczesniak, attempt to have him barred from testifying, or otherwise impugn his reputation with the court.

The Court also finds that Brodsky's attempts at mitigation were wholly inadequate for his egregious conduct. After retaining counsel, he moved to withdraw some of the pleadings where he accused Szczesniak of misconduct and eventually withdrew from representing the Defendant. While this could potentially have abrogated Szczesniak's Rule 11 motion, his attempt to withdraw some pleadings is inadequate to spare Brodsky from the inherent authority of this Court to sanction him. To date, he has not provided any explanation for his repeated inflammatory and unsubstantiated accusations.

Furthermore, at the hearing, Brodsky gave an apology in name only. He did not appear contrite and did not offer any explanation for his conduct directed toward Szczesniak. In fact, he has failed to provide any explanation for his egregious conduct whatsoever outside of blaming his frustrations with opposing counsel. He also attempted, without subjecting himself to cross-examination, to blame Ms. Weinberger for his allegations against Szczesniak. His failure to take responsibility for his actions amplifies the need for sanctions in this case. Additionally, his conduct as an observer during the hearing was entirely inappropriate and undermines any apology he provided to the Court. Throughout the hearing, Brodsky was occupied with his phone and frequently shook his head and sighed when evidence or argument was presented by Plaintiff's or Szczesniak's counsel.

Exacerbating the need for sanctions, Brodsky had numerous opportunities to avoid a formal retribution from the Court. Throughout the course of the litigation, Brodsky was warned numerous times to curb his vitriolic conduct. Instead of heeding the Court's advice, at every opportunity, he increased his acerbic behavior, culminating in his unhinged attack against Szczesniak.

In doing so, Brodsky acted in bad faith and if left unpunished, his actions would serve to undermine the integrity of this Court. *See Mach v. Will County Sheriff*, 580 F.3d 495, 501 (7th Cir. 2009) (bad faith includes harassment, willful disobedience, and "recklessly making a frivolous claim"); *Carr v. Tillery*, 591 F.3d 909, 920 (7th Cir. 2010) (finding that party acted deserving of sanctions when filed pleading "so lacking in merit . . . that its pursuit . . . indicates a motive to harass"). Although the imposition of sanctions against Brodsky for some of his conduct, including frivolous filings and unprofessional conduct could be sustained under Section 1927 or Rule 11, his allegations levied against Donald Szczesniak demand the invocation of the court's inherent authority to sanction. That is because "[t]he imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the []purpose of 'vindicat[ing] judicial authority without resort to the more drastic sanctions available for contempt of court.'" *Chambers*, 501 U.S. at 46 (quotation omitted). Brodsky's actions undermine the integrity of the judicial system and such behavior cannot go undeterred.

Sadly, the Court learned of numerous other instances in state court where Brodsky has been left unscathed by sanctions which might have led to his belief that he could act with impunity when acting as a litigator in court. That stops here. Protecting the integrity of the court as a place where litigants can fairly and professionally access justice remains this Court's

14

paramount concern. Respect for the court, the rule of law, and lawyers themselves is essential to an orderly society. Once an individual is given the privilege to serve as a lawyer, as an officer of the court, he is held to professional standards that are essential to the preservation of justice and the protection of those clients he serves. Any deviance from that course of professional conduct should not be tolerated.

## CONCLUSION

Due to the repeated violations of this Court's orders to refrain from the aggressive, unprofessional and vitriolic behavior, the Court grants the motion for sanctions [194] and imposes the following sanctions: 1) Brodsky shall pay a fine of $50,000 to the Clerk of the Court; 2) Brodsky shall attend an ethics course approved by the Attorney Registration and Disciplinary Commission and provide the Court with verification of completion of the course; 3) Brodsky shall attend an anger management course and provide the court with verification of the successful completion of the course; and 4) the Court shall refer Brodsky to the Executive Committee for consideration of being barred or suspended from practicing in the Northern District of Illinois for his failure to abide by Court rules.

Date: March 28, 2018

Hon. Virginia M. Kendall
United States District Judge